Duncan Peder McKENZIE, Jr.,
Petitioner–Appellant,

v.

Henry RISLEY, et al.,
Respondents–Appellees.

No. 85–4156.

United States Court of Appeals,
Ninth Circuit.

Argued En Banc and Submitted
Aug. 12, 1987.

Decided March 10, 1988.

Timothy K. Ford, Seattle, Wash., for petitioner-appellant.

Chris D. Tweeten, Asst. Atty. Gen., Helena, Mont., for respondents-appellees.

Before WALLACE, FLETCHER, FARRIS, PREGERSON, ALARCON, CANBY, NORRIS, WIGGINS, BRUNETTI, KOZINSKI and O'SCANNLAIN, Circuit Judges.

## OPINION

KOZINSKI, Circuit Judge:

Appellant Duncan Peder McKenzie, Jr., convicted of murder and sentenced to death by the State of Montana, appeals from the district court's dismissal of his petition for writ of habeas corpus. A panel of this court affirmed the dismissal in *McKenzie v. Risley*, 801 F.2d 1519 (9th Cir.1986), but McKenzie's suggestion for rehearing en banc was subsequently granted. 815 F.2d 1323 (9th Cir.1987). We now affirm.

## I. BACKGROUND

The Montana Supreme Court described the facts as follows:

The victim in this case was Lana Harding, a 23 year old rural school teacher in Pondera County, Montana. On Tuesday morning, January 22, 1974, she failed to appear at school. At the Pioneer School teacherage where she lived the bed was found in a disheveled condition. The sheriff of Pondera County was called and officers were dispatched to the school arriving there midmorning.

Investigation that day revealed (1) a red tennis shoe belonging to Lana Harding just outside the school, (2) a drag trail from the teacherage to a nearby road, (3) blood near the end of the drag trail (later identified as Lana's type and RH factor) and (4) a wrist watch belonging to Lana in the same area as the blood. Lana Harding was last seen in Conrad, Montana, 13 miles from the teacherage on Monday, January 21, at about 5:00 p.m.

Defendant had recently moved into the community and was working for the K & K Wholesale Seed Company, located approximately three miles from the Pioneer School teacherage. A day or so before January 21 he made arrangements to buy a 1948 black Dodge pickup, recognizable to most inhabitants of the area because it had belonged to one local owner for a long period of time. On January 21 defendant had worked on the pickup after work. He was seen leaving K & K Wholesale Seed Company at approximately 6:45 p.m. in his black pickup headed toward his place of residence not far from the teacherage. The pickup was seen about 7:00 p.m. about a mile from the teacherage.

Approximately an hour later, around 8:00 p.m., defendant knocked on the door of the Pearson farm residence located across the road from the teacherage. He asked for assistance in starting his pickup. It was later determined his pickup was parked in the road at a point where the drag trail ended and where the blood and watch were found the following day. At the Pearson residence defendant asked directions to his own residence and called his wife to say he was coming home. Don Pearson pulled the pickup, got it started and noted defendant did not drive on towards his place of residence. Shortly thereafter, the pickup was seen being driven toward the drill where Lana's body was found the following day.

Her body was found clothed only in a shirt[,] sweater and bra. It was draped over the tongue of a grain drill. She had been severely beaten about the head and body. The forensic pathologist who examined the body testified the death blow had been delivered to the head and laid open the right side. A rope was tied around her neck; there was evidence she had been strangled; however pressure had been released so she did not die of strangulation. A coil of wire was entangled in her hair, later shown to have come from a roll of wire found in the back of defendant's pickup.

During the search for the body and the investigation of the homicide three additional items were found: (1) A pair of gloves worn by defendant at work were found in a field not far from where the body was discovered with human blood on them, (2) overshoes with Lana's type blood and brain tissue on them were found about a quarter of a mile away, and impressions from the soles matched the heels of boots later taken from defendant's home; and (3) Lana's purse was found near the place where the overshoes were covered.

As a result of the investigation by the sheriff and his deputies, the county attorney, on Tuesday afternoon, January 22, filed a complaint charging defendant with assault before the justice of the peace. The county attorney also obtained a warrant for the arrest of defendant and a search warrant.

Defendant was thereafter arrested at his home. The black Dodge pickup was seized and impounded and blood was found in the bed of the pickup and on the springs; the back end of the pickup had been recently sprayed with black paint; the spray paint was later identified by FBI experts as identical to paint brand-named "Weekend" which was not available in the Conrad–Pondera County, Montana area. A can of the black spray paint was found in the cab of the pickup and another was later found at defendant's home.

The following items were found in the back of the pickup: (1) a coil of wire later identified as having been the source of wire found in the victim's hair, (2) an exhaust manifold that had been painted black, and (3) human blood of the same kind and RH factor as Lana's and brain and corticle tissue were found on the manifold. Dr. John Pfaff, who examined the victim's body and the manifold, testified that the manifold could have inflicted the fatal blow.

At the drill site where the body was located, a piece of brass from a water pump was found. The prior owner of the Dodge pickup testified this piece of brass was in [the] back of the pickup when defendant took possession of the pickup on January 19.

Several co-workers at the K & K Wholesale Seed Co. testified at trial that defendant had said on January 21 that he

broke in every new vehicle by engaging in sexual intercourse in [it]. Several days before defendant had remarked that he had had intercourse with country school teachers; and that they were naive, he could teach them, and they were easy to get.

Subsequently defendant was charged with several crimes to which he entered pleas of not guilty. Following trial, he was convicted by a jury of the crimes of deliberate homicide by means of torture and aggravated kidnapping. Judgment was entered thereon and a death sentence imposed. Defendant appealed.

*State v. McKenzie,* 186 Mont. 481, 608 P.2d 428, 434–36 (1980) (*McKenzie III* ).

The panel opinion summarized the extensive procedural history of the case:

The Montana Supreme Court affirmed the convictions and the sentence. *State v. McKenzie (I),* 557 P.2d 1023, 171 Mont. 278 (1976). The Montana Supreme Court rejected McKenzie's claim, *inter alia,* that the trial court's jury instructions on presumptions and the Montana death penalty statute violated the Constitution. The United States Supreme Court granted certiorari, vacated the judgment, and remanded for further consideration in light of *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). *McKenzie v. Montana,* 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed.2d 1089 (1977).

On remand, the Montana Supreme Court, after reexamining all of the issues raised by McKenzie, adhered to its original decision. *State v. McKenzie (II),* 581 P.2d 1205, 177 Mont. 280 (1978). The Montana Court held that the jury instructions did not erroneously shift the burden of proof on the issue of intent, but even if they did, such an error would not have affected the jury's verdict because the evidence of intent was overwhelming. 581 P.2d at 1223–24.

Following the Montana Supreme Court's affirmance of the convictions and the sentence in *McKenzie II,* McKenzie sought relief through the Sentence Review Division of the Montana [Supreme] Court. His petition for review was denied. His attempted appeal of that decision to the Montana Supreme Court was also denied because there was no appeal from a decision of the Sentence Review Division.

McKenzie again petitioned for certiorari to the United States Supreme Court. Certiorari was granted, the judgment was vacated, and the case was remanded for further consideration in light of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). *McKenzie v. Montana,* 443 U.S. 903, 99 S.Ct. 3094, 61 L.Ed.2d 871 (1979). The Montana Supreme Court once again affirmed the convictions and the sentence. *State v. McKenzie (III),* 608 P.2d 428, 186 Mont. 481 (1980). This time, however, the Montana Court conceded that some of the jury instructions unconstitutionally shifted the burden of proof to McKenzie to disprove that he had the criminal intent necessary to support his conviction. 608 P.2d at 457–58. His conviction was nevertheless reaffirmed because the court found the unconstitutional jury instructions harmless beyond a reasonable doubt in light of the overwhelming evidence of intent. 608 P.2d at 459.

McKenzie once again sought certiorari from the United States Supreme Court. This time certiorari was denied. *McKenzie v. Montana,* 449 U.S. 1050, 101 S.Ct. 626, 66 L.Ed.2d 507 (1980) (Justices Marshall and Brennan dissenting). McKenzie then filed a petition for post-conviction relief or habeas corpus in the Montana state district court. The petition was denied. The denial was affirmed by the Montana Supreme Court. *McKenzie v. Osborne (McKenzie IV),* 640 P.2d 368, 195 Mont. 26 (1981).

McKenzie then filed a petition for a writ of habeas corpus in federal district court. The district court dismissed the petition and it is from that dismissal that McKenzie timely appeals to this court.

801 F.2d at 1522–23.

The panel rejected all of McKenzie's arguments and affirmed. McKenzie petitioned for rehearing of three questions resolved by the panel: (1) whether the *Sandstrom* errors in the jury instructions were harmless; (2) whether the trial judge's decision to sentence McKenzie to death after he had approved a plea agreement calling for a prison sentence violated *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968); and (3) whether the statutory scheme under which

McKenzie was sentenced was constitutional. Except as otherwise indicated below, we address only the issues raised by McKenzie on rehearing.

## II. DISCUSSION

### A. *Sandstrom Error*

1. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970), held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." The Court has since interpreted *Winship* to preclude a state from shifting to the defendant the burden of proof on any element of the crime charged. *Patterson v. New York*, 432 U.S. 197, 215–16, 97 S.Ct. 2319, 2329–30, 53 L.Ed.2d 281 (1977); *Mullaney v. Wilbur*, 421 U.S. 684, 697–701, 95 S.Ct. 1881, 1888–1891, 44 L.Ed.2d 508 (1975). In *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the Supreme Court applied *Mullaney* and *Winship* to hold unconstitutional a Montana jury instruction which stated that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." *Id.* at 513, 99 S.Ct. at 2453. The Court held that this instruction may have been interpreted by the jury as shifting the burden of proof on intent—an element of the crime [1]—to the defendant, undermining his constitutional right to be presumed innocent. *Id.* at 524, 99 S.Ct. at 2459.

The parties agree that some of the jury instructions given in this case violated *Sandstrom*.[2] Specifically, the jury was instructed that:

> [T]he law presumes, that is, the law expressly directs the jury to reason: That an unlawful act was done with an unlawful intent and also that a person is presumed to intend the ordinary consequences of his voluntary act.
>
> . . . .
>
> Further, unless you are otherwise instructed with regard to a particular presumption, all presumptions are rebuttable; that is, they may be controverted and overcome by other evidence.

Add'l Instr. No. 31, App. at C–21 [at 1563].[3] Similar instructions were given on the elements of various offenses.[4] While these

---

1. Sandstrom was charged with committing deliberate homicide in violation of Revised Code of Montana (R.C.M.) § 94–5–102(1)(a), which required a finding that he "purposely or knowingly" killed his victim.

2. The dissent goes further, claiming that the instructions were internally inconsistent, ambiguous and incoherent. *Post* at 1543–44, 1548–49, 1549–50, 1554. While *Sandstrom* rendered the instructions partially invalid, they accurately reflected the state of the law when given. Moreover, they were not confusing, contradictory or incoherent. Except for the *Sandstrom* errors, the instructions were entirely adequate,and provided the jurors with an appropriate and understandable framework to guide their deliberations. Indeed, the instructions on the two crimes for which McKenzie was ultimately convicted—deliberate homicide by means of torture and aggravated kidnapping—were free from *Sandstrom* error, clearly and unambiguously permitting the jury to find intent through inferences while forbidding it to rely on presumptions. *See* Add'l Instrs. 34, 36, Appendix to Dissent (App.) at 1565, 1566.

The dissent makes much of the condemnatory language used by the two dissenting justices in *McKenzie IV. Post* at 1549–50. But these justices' disagreements with the majority were

based largely on issues not before us, including questions of state law as to which we must accept the five-member majority's determination. Since these critical statements were not made solely or even primarily in reference to the *Sandstrom* errors, we question their relevance to the case before us.

3. The trial judge gave a number of general jury instructions before any evidence was presented, and gave further instructions orally after the close of the defendant's case. These will be cited respectively as "Instrs." and "Add'l Instrs." Written copies of both sets of instructions were given to the jury for use during its deliberations. State Trial Transcript (R.T.) at 2601.

4. With respect to deliberate homicide, the jury was told:

> If you find beyond a reasonable doubt that the defendant … voluntarily committed an illegal act on Lana Harding, such as assaulting or injuring her, the law presumes that an unlawful act was done with an unlawful intent; that is, the law expressly directs you to reason from such unlawful act that the defendant acted with an unlawful intent, or purpose.
>
> This is a rebuttable presumption, which means it may be controverted and overcome by other evidence....

instructions did not require the jury to conclusively presume intent, they did permit a rational juror to believe that intent could be found without proof by the prosecution, thereby shifting the burden of proof on this issue to the defense.[5]

The state does not deny that the instructions contained multiple *Sandstrom* errors. It argues instead—and every court considering the issue has found—that, because of the unique circumstances of McKenzie's trial, the errors were harmless beyond a reasonable doubt.

■ Until recently, the question of whether *Sandstrom* errors could be harmless had not been authoritatively resolved. In *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 3108–09, 92 L.Ed.2d 460 (1986), however, the Supreme Court held that the harmless error standard of *Chapman v. California*,

> The law also presumes that a person intends the ordinary consequences of his voluntary act.
>
> Therefore, if you find beyond a reasonable doubt that the defendant ... voluntarily and unlawfully assaulted or injured Lana Harding, and if you further find beyond a reasonable doubt that the death would result as the ordinary consequence of such an assault or injury, the law presumes that, and expressly directs you to reason therefrom that the defendant intended to cause said death regardless of whether or not he actually had such an intent or purpose.

Add'l Instr. No. 33, App. at 1564. Similarly, with respect to kidnapping, the jury was instructed:

> If you find beyond a reasonable doubt that the defendant ... without lawful authority, restrained Lana Harding ... the law presumes that he acted therein with an unlawful intent, purpose or knowledge, and expressly directs you to so reason.
>
> This ... is ... a rebuttable presumption subject to being controverted and overcome by other evidence....

Add'l Instr. No. 35, App. at 1565 to 66. In all, McKenzie asserts that 14 instructions violated *Sandstrom*.

5. McKenzie argues that the jury could have interpreted Additional Instruction 30 as calling for a conclusive presumption of intent once it determined that McKenzie was sane when he committed the crimes charged. *See* Add'l Instr. No. 30, App. at 1562. However, the jury was charged that all presumptions were rebuttable unless otherwise indicated. Reading these instructions together, as we must, we find no irrebuttable presumptions. *See Francis v. Frank-*

386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), applied to such errors. In *Pope v. Illinois*, — U.S. —, 107 S.Ct. 1918, 95 L.Ed.2d 435 (1987), the Court further explicated the proper role of an appellate court in applying *Clark*'s harmless error analysis. In *Pope* the Court articulated the test as follows: whether "the facts found by the jury were such that it is clear beyond a reasonable doubt that if the jury had never heard the impermissible instruction its verdict would have been the same."[6] 107 S.Ct. at 1922 n. 6. Significantly, the Court held that even if the jury did in fact have "the impermissible presumption in mind when it considered the [relevant] element" of the crime, the error would be harmless "if the facts that the jury necessarily found established guilt beyond a reasonable doubt." *Id.* at 1922.[7]

*lin*, 471 U.S. 307, 318–19, 322–23 n. 8, 105 S.Ct. 1965, 1973–74, 1975–76 n. 8, 85 L.Ed.2d 344 (1985) (ambiguity in one instruction may be cured by sufficiently clear language in other portions of jury charge); *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed. 2d 368 (1973) ("a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge"). Of course, the fact that the presumption was rebuttable does not render it any less erroneous.

6. The dissent contends that we disregard this test, examining instead whether the jury in fact relied on the improper instructions. *See post* at 1550–51. This is simply not so. As we demonstrate below, the facts found by the jury *without* reliance on the tainted instructions demonstrate beyond a reasonable doubt that the jury could not have reached a different conclusion on the issue of intent even if it had been properly instructed. Thus, even if the jury did rely on the improper instructions, the error was harmless.

7. McKenzie and the dissent attempt to distinguish *Clark* by noting that it involved only one erroneous instruction, whereas multiple errors were committed at McKenzie's trial. This distinction is irrelevant. While the presence of multiple erroneous instructions may make it more likely that the unconstitutional presumption played a material role in the jury's decision, it has no bearing on whether the result would have been the same even absent the *Sandstrom* errors. Since even one *Sandstrom* instruction requires a reviewing court to assume that the jury in fact relied on the improper presumption in reaching its verdict, multiple *Sandstrom* in-

Once an error of constitutional magnitude is shown, the state has the burden of establishing beyond a reasonable doubt that the error was harmless. *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828. The Montana Supreme Court and the district court considering McKenzie's habeas corpus petition both concluded that the state had met its burden. *McKenzie III*, 608 P.2d at 459; Mem. op. at 19 (D.Mont. Aug. 16, 1985), E.R. 58 at 19. In cases involving petitions for habeas corpus we review a district court's determinations de novo. *Herd v. Kincheloe*, 800 F.2d 1526, 1528 (9th Cir.1986). Moreover, the ultimate determination of whether *Sandstrom* error was harmless is also subject to de novo review as a question of federal constitutional law. *Herd*, 800 F.2d at 1528; *see also Rushen v. Spain*, 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983) (per curiam). However, the factual findings underlying the state court's determination of harmless error are entitled to a presumption of correctness under 28 U.S.C. § 2254(d) (1982). *Rushen*, 464 U.S. at 120, 104 S.Ct. at 456. We must defer to such state court factual findings "in the absence of 'convincing evidence' to the contrary," *id.*, and may set them aside only if they "lac[k] even 'fair support' in the record." *Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983).[8]

2. In the case before us, the jury found beyond a reasonable doubt, without relying on any unconstitutional presumptions, that McKenzie kidnaped, tortured and killed Lana Harding. Thus, the determinative issue is whether the facts found by the jury compel the conclusion that McKenzie acted with the requisite criminal intent in committing these acts.

McKenzie offered no evidence bearing directly on his intent. Instead, "[t]he 'defense at trial focused entirely on the issue of mental competence, relying on the traditional insanity defense as well as the defense of diminished capacity.'" Appellant's Petition for Rehearing at 1 (quoting *McKenzie v. Risley*, 801 F.2d 1519, 1525 (9th Cir.1986)).[9] With respect to mental capacity, Dr. Wetzler, the defense psychiatrist, testified that McKenzie was incapable of forming the requisite intent because he lacked mental capacity. From this McKenzie concludes that the *Sandstrom* errors could not possibly have been harmless beyond a reasonable doubt, because in order to reach such a conclusion a reviewing court would be required to weigh the credibility of the respective expert witnesses. *See, e.g., Bowen v. Kemp*, 832 F.2d 546, 551 (11th Cir.1987) (en banc) (where there is substantial evidence that defendant may have lacked requisite intent, *Sandstrom* error cannot be harmless on the ground that the evidence of intent is overwhelming).

We have given this argument careful consideration but remain unpersuaded. That a defendant contested intent does not automatically render the *Sandstrom* error prejudicial. *Rose v. Clark* is precisely on point. Defendant there raised the defenses of insanity and lack of mental capacity, and introduced expert and other testimony to show that he was insane, that he suffered from amnesia and could not remember the events of the crime, and that he had been drinking heavily before the alleged criminal activity. 106 S.Ct. at 3104. The trial court's instruction placed on the defendant the burden of disproving "malice," which was defined as "an intent to do any injury

---

structions cannot compound the error. We reject the dissent's apparent suggestion that the nature of our inquiry varies with the number of erroneous instructions.

8. The Montana Supreme Court found that the evidence proved beyond a reasonable doubt that McKenzie acted purposely or knowingly when he kidnaped, tortured and killed Lana Harding, *McKenzie II*, 581 P.2d at 1224, and that no reasonable juror could have found otherwise, *McKenzie III*, 608 P.2d at 459. It is clear that

the presumption of correctness applies to state appellate court findings of intent. *Cabana v. Bullock*, 474 U.S. 376, 106 S.Ct. 689, 697–98 & n. 5, 88 L.Ed.2d 704 (1986), *overruled in part on other grounds, Pope v. Illinois*, —— U.S. ——, 107 S.Ct. 1918, 1922 n. 7, 95 L.Ed.2d 439 (1987).

9. McKenzie also attempted to raise a reasonable doubt in the jurors' minds as to the identity of the perpetrator of the crime. However, the jury indisputably found beyond a reasonable doubt that McKenzie committed the acts at issue.

to another." *Id.* The Supreme Court stated:

> The [Court of Appeals] concluded that a *Sandstrom* error could never be harmless where a defendant contests intent.... But our harmless error cases do not turn on whether the defendant conceded the factual issue on which the error bore. Rather, we have held that "*Chapman* mandates consideration of the entire record prior to reversing a conviction for constitutional errors that may be harmless." *United States v. Hasting*, 461 U.S., at 509, n. 7, 103 S.Ct., at 1981, n. 7. The question is whether, "on the whole record ... the error ... [is] harmless beyond a reasonable doubt." *Id.*, at 510, 103 S.Ct., at 1981.

*Id.* at 3109 (citation omitted).[10]

■ There are a variety of ways in which a jury can develop a reasonable doubt about whether a defendant had the requisite intent. One possibility is for the jury to conclude that the defendant lacked the mental capacity to form intent or, more precisely, that there is reasonable doubt on that issue. Alternatively, the jury might find intent lacking because of some other circumstance, for example, that defendant was acting as a result of mistake or accident, or in the heat of passion, or (as to specific intent) under the influence of alcohol or drugs. Our function under *Clark* is

to determine whether the jury in McKenzie's case could have developed a reasonable doubt about intent on any of these theories, had it "never heard the impermissible instruction[s]." *Pope*, 107 S.Ct. at 1922 n. 6.

a. Because McKenzie specifically raised diminished capacity as a defense, we consider that issue first. Defendant's evidence that he lacked capacity to form the requisite intent consisted solely of the testimony of Dr. Wetzler, a forensic psychiatrist. Dr. Wetzler repeatedly testified that McKenzie, at the time he committed the acts in question, lacked the capacity to form the states of mind that were elements of the offenses charged. R.T. at 2255, 2268–69, 2581.[11] An examination of the jury instructions reveals that the jury *necessarily* rejected this testimony beyond a reasonable doubt in reaching its verdict.[12]

■ Although numerous instructions informed the jury that it could presume intent from conduct, one clear and explicit exception was made to this general rule. The crimes of aggravated kidnaping and deliberate homicide by means of torture were, as defined for the jury, essentially specific intent crimes. Each required the jury to find that the defendant purposely committed the underlying criminal acts and did so for some further "particular pur-

---

10. *Clark* implicitly overrules our cases holding that harmless error analysis is inapplicable where the defendant contests intent. *See, e.g., Church v. Kincheloe,* 767 F.2d 639, 642 (9th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986); *Hagler v. Callahan,* 764 F.2d 711, 714 (9th Cir.1985); *In re Hamilton,* 721 F.2d 1189, 1191 (9th Cir.1983). We explicitly overrule them today. *Bowen v. Kemp,* 832 F.2d 546 (11th Cir.1987), is not to the contrary. In that case the court held that "[w]hen intent is at issue, ... we cannot infer overwhelming evidence of intent directly from the physical sequence that resulted in the victim's death. We must also look at the evidence of defendant's state of mind." *Id.* at 551. Although the *Bowen* court found that the evidence of mental incapacity in that particular case was sufficiently substantial to preclude a finding of harmless error, this is necessarily a fact-bound inquiry, and the result will vary depending on the particular circumstances of each case. The *Bowen* court, moreover, recognized that the de-

fendant's conduct was ambiguous, *id.,* thereby casting further doubt on defendant's intent. *Bowen* does not attempt to fashion a per se rule of the type created by *In re Hamilton,* 721 F.2d at 1191, and explicitly disapproved by the Supreme Court in *Clark.*

11. Dr. Wetzler expressed related concepts elsewhere in his testimony. R.T. at 2261 ("[McKenzie] has no behavior control.... He didn't know what he was doing"); *id.* at 2299 ("I don't feel [McKenzie] appreciated he knew [sic] what he was doing"); *see also id.* at 2304.

12. The jury also rejected Dr. Wetzler's testimony that McKenzie was insane. We draw no inferences from this fact, however, because the burden of proof as to insanity was on the defendant under a preponderance of the evidence standard. The jury therefore need not have found beyond a reasonable doubt that McKenzie was sane.

pose." [13] And, with respect to those "particular purposes," the jury was instructed that it *could not rely on any presumptions* in finding that the defendant acted with the requisite mental state; rather, it was required to reason by inference from the established facts.[14] The jury found that McKenzie committed both of these specific intent crimes, and we must presume that it followed the applicable instructions in doing so. *Francis*, 471 U.S. at 324–25 n. 9, 105 S.Ct. at 1976–77 n. 9; *Parker v. Randolph*, 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979) (opinion of Rehnquist, J.). Accordingly, the jury must have found, without relying on the unconstitutional presumptions,[15]

that McKenzie acted with the requisite "particular purposes" in mind when he committed his crimes.[16] In reaching this conclusion the jury necessarily found that McKenzie was capable of forming specific criminal intent.

■ Dr. Wetzler never differentiated between specific and general intent. Rather, he stated categorically that McKenzie lacked the capacity to form *any* of the requisite mental states. Thus, there would have been no basis on which the jury could rationally find that McKenzie possessed the mental capacity to form, and act upon, a "particular purpose," yet at the same time lacked the capacity to act "purposely or knowingly."[17] In finding that McKenzie

---

**13.** In order to convict McKenzie of aggravated kidnaping, the jury was told it had to find that he committed the kidnaping "for the *particular purpose* of facilitating the commission of a felony: either sexual intercourse with Lana Harding without her consent, or to commit an Aggravated Assault on her." Add'l Instr. No. 36, App. at 1566 (emphasis added). On the charge of deliberate homicide by means of torture, the jury had to find that McKenzie

> purposely assaulted Lana Harding physically and inflicted cruel suffering upon her and in so doing caused her death ... for one or more of the *particular purposes* charged; either, (a) to extort something from her, or (b) to persuade her to do something against her will, or (c) to satisfy some other untoward propensity of the defendant.

Add'l Instr. No. 34, App. at 1565 (emphasis added). "Purpose" was defined for the jury as a "conscious object to engage in [certain] conduct or to cause [a certain] result." Instr. No. 10, App. at 1558.

**14.** Additional Instruction 32 stated: "In offenses which require proof of a particular purpose the particular purpose required may never be proved by means of legal presumptions, but must be proved by means of inferences only." App. at 1563–64. Similarly, Additional Instruction 34 stated: "The mental state of purposely assaulting another physically ... cannot be proved by using the legal presumptions you have been directed to use in the proof of deliberate homicide, and must be proved by the use of inferences alone." App. at 1565. *See also* Add'l Instr. No. 36, App. at 1566 (aggravated kidnaping).

**15.** McKenzie argues that the instructions were ambiguous, and that the jury might have believed it could rely on the improper presumptions in finding "particular purposes." We cannot agree. The judge's instructions on this point

were crystal clear and we do not see how any rational juror could have misinterpreted them. McKenzie relies on the fact that one of the "particular purposes" that could have justified a finding of aggravated kidnaping involved "facilitating the commission of a felony," Add'l Instr. No. 36, App. at 1566, and that the jury was elsewhere instructed that it could rely on the unconstitutional presumptions in finding that the defendant committed either of the applicable underlying felonies. No reasonable juror would have followed this tortured chain of reasoning to conclude that the presumptions could be applied in finding the particular purposes when the judge had expressly and unambiguously stated to the contrary. In any event, no similar objection can be raised to the implicit finding of mental capacity underlying the conviction for deliberate homicide by means of torture.

**16.** The dissent concludes from this analysis that "the majority adopts the state's view that the jury must have considered the 'particular purpose' element before the 'knowingly and purposely' element." *Post* at 1554. We disavow this characterization. The order in which the jury considered these two elements is irrelevant. The point is that the instructions unambiguously prohibited reliance on the presumption in finding the "particular purposes," and thus we know that the jury found these purposes, and the capacity to form them, without reliance on the unconstitutional presumption. The dissent's argument—that the finding that McKenzie acted "knowingly and purposely" somehow "tainted" the finding that he acted in furtherance of "particular purposes"—is inconsistent with our responsibility to presume that the jury followed its instructions.

**17.** A finding of capacity to form specific intent necessarily encompasses a finding of capacity to form general intent, since the former requires

had the capacity to form the requisite specific intent, the jury necessarily rejected Dr. Wetzler's testimony on this point,[18] and instead accepted the testimony of the prosecution's witnesses that McKenzie was capable of forming general and specific criminal intent.[19]

In response to this line of reasoning, which was adopted by the district court, McKenzie argues that the jury was in fact told it could presume his mental capacity to form criminal intent. He points to Additional Instruction 30, which states:

> The knowledge or purpose with which an act is done is manifested by the circumstances connected with the offense and the sound mind of the accused. All persons are of sound mind who are not afflicted with a disease or defect of the mind which excludes responsibility for their conduct.
>
> Upon the trial of the issues raised by the pleas of "Not Guilty" to the charges made in the Information, the defendant is presumed to have been free from any

disease or defect of the mind which excludes responsibility for his conduct at the time the offenses are alleged to have been committed and to be [free from any disease or defect of the mind which excludes his responsibility] now.[20]

App. at 1562. McKenzie contends that, by creating a presumption that "[a]ll persons are of sound mind," this instruction permitted the jury to presume not merely that the defendant was sane but that he possessed the mental capacity to form intent as well.

Additional Instruction 30 cannot be read so broadly. Taken in context, it is clear that the presumption applies solely to defendant's "responsibility for his conduct," Montana's formulation of legal sanity. The jury was carefully instructed that the insanity defense is an affirmative defense that "goes only to the mental responsibility and control of the defendant," Add'l Instr. No. 53, App. at 1571, and that a defendant's criminal responsibility is presumed. The *only* reference in the instructions to mental capacity occurs at the end of Instruction 53:

> existence. Is this defendant capable of [a] high probability of knowledge?
> A No.
> Q Existence of that type of fact in that type of situation?
> A Which one are you reading, Mr. Reagan?
> Q Top of page 9 [App. at 1559 (KNOWINGLY Defined)]
> ....
> A I do not feel that he was aware of what he was doing.
> R.T. at 2578.

We fail to understand how this unadorned reference to the definition of "knowingly" supports McKenzie's argument.

---

the higher degree of mental awareness and cognitive ability. It is for this reason that certain factors, such as intoxication, can affect a defendant's capacity to form specific intent while leaving intact his capacity to form general intent. *See, e.g., State v. Lukus,* 149 Mont. 45, 423 P.2d 49, 55 (1967) (intoxication is a defense to crimes requiring specific intent or "particular purpose," but not to general intent crimes).

**18.** McKenzie points to the following testimony of Dr. Wetzler as support for his assertion that the jury could have found mental capacity to form specific intent without rejecting Dr. Wetzler's testimony as to capacity to form general intent:

> Q [Mr. Reagan, defense counsel] And the Court provided you with certain definitions that it has heretofore given to the jury?
> A I presume so, yes. I have a copy of it[sic].
> Q And among those are purposely and knowingly?
> A Yes; purposely defined on page 8 [App. at C–9, at 1558].
> Q Starts on page 8?
> A Yes.
> Q And describes [knowingly] there, and part of this definition is when knowledge of the particular act [is an] element of [the] offence [sic], such knowledge is established, if a person is aware of [a] high probability of its

**19.** The fact that the jury rejected the only evidence of mental incapacity distinguishes this case from the Eleventh Circuit's ruling in *Bowen v. Kemp,* 832 F.2d 546, where there was substantial evidence to support a finding of mental incapacity and the jury had no occasion to resolve the issue.

**20.** The instructions as read to the jury contained the bracketed language indicated in the second paragraph of Instruction 30. R.T. of Tape of Instructions at 2; *cf.* R.T. at 2601. The written instructions contained, in place of this language, the word "sane." Regardless of which alternative the jury actually relied on, our analysis remains the same.

If you find beyond a reasonable doubt that the defendant did do [the acts charged] or any of them you must then consider whether or not the defendant has overcome the presumption of accountability and whether or not he has created a reasonable doubt in your minds as to his mental accountability and responsibility for any of the acts you may find he committed, *and whether or not he could have had the requisite mental state for the act or acts which you have found he committed.*

*Id.* (emphasis added).

This instruction makes clear that the defendant's capacity to form the requisite mental state is an issue distinct from his legal sanity or "responsibility." The jury was elsewhere instructed that the prosecution bore the burden of proving each element of the crime beyond a reasonable doubt. Instr. No. 6, App. at 1567; Add'l Instr. No. 39, App. at 1558. The jury properly resolved the issue of mental capacity without the benefit of any presumptions.

■ b. Once we have determined that the jury must have rejected McKenzie's diminished capacity defense, we have little difficulty concluding it could not have developed a reasonable doubt as to intent on any other basis. The largely undisputed facts presented at trial provide no support for any other result. There is no possibility, for example, that the jury might have found that McKenzie's acts were committed accidentally, by mistake, in the heat of passion or under the influence of drugs or alcohol, and defendant never attempted to raise any of these defenses.

McKenzie kidnaped Lana Harding from the teacherage and dragged her to his truck. *McKenzie III,* 608 P.2d at 435; R.T. at 594–95, 1401–03, 1661–63, 1992–93, 2118–20, 2175–82. He strangled her by tightening and loosening a rope around her neck. R.T. at 585–90. He beat her severely and repeatedly on the head, inflicting several wounds that fractured and partially crushed her skull and penetrated to her brain. R.T. at 562–67, 570, 577–79, 581–82. The most severe of these blows exposed "multiple pieces of bone and brain" tissue, R.T. at 577–78, and she died within minutes of receiving this injury, R.T. at 564, some 30 to 45 minutes after she was strangled. R.T. at 586, 606. These criminal acts took place over a relatively long period of time and at different locations; they involved a variety of actions wholly inconsistent with any state of mind other than intentional conduct. The sophisticated and complex nature of the crime, the multiple and varied forms of criminal acts committed, and the duration of the activity foreclose any alternative explanations.[21]

No reasonable juror, after being presented with this uncontroverted evidence, and after finding that McKenzie was sane and possessed the requisite mental capacity, could have failed to find that he acted with intent when he committed the brutal assault on Ms. Harding. *See Sturgis v. Goldsmith,* 796 F.2d 1103, 1107 (9th Cir. 1986) (*Sandstrom* error harmless where defendant announced his intention to kill and "accomplished this aim gradually over a one and a half hour period, using strangling when stabbing appeared to be ineffective and later returning to the stabbing technique"); *Hagler,* 764 F.2d at 715–16 (*Sandstrom* error harmless where "victim was shot three times, twice in the head, and one of the shots was fired at point-blank range"); *McGuinn v. Crist,* 657 F.2d 1107, 1108 (9th Cir.1981) (*Sandstrom* error harmless where victim "was shot four times in the head at close range firmly negating any reasonable possibility that the killing occurred as a result of recklessness or negligence"), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 850 (1982). We " 'find that the record developed at trial established guilt beyond a reasonable doubt....' " *Pope v. Illinois,* 107 S.Ct. at 1922 (quoting *Rose v. Clark,* 106 S.Ct. at 3107). We therefore hold that the *Sandstrom* errors were harmless.

---

**21.** There was no evidence that McKenzie was intoxicated or under the influence of a drug that might have affected his ability to form intent.

### B. *Imposition of Death Sentence After Approval of Plea Bargain*

On Sunday, December 22, 1974, approximately two and one-half weeks before McKenzie's trial was scheduled to begin, the prosecution and defense counsel reached a tentative agreement permitting McKenzie to plead guilty to two of the charged offenses in exchange for receiving a fifty-year sentence. On the following day, counsel for McKenzie and the state met with the trial judge who reluctantly approved the proposal and set December 30 as the date to receive the plea. On the evening of December 23, the attorneys met again and defense counsel left the meeting believing that a final binding agreement had been reached. The prosecutors, on the other hand, had the impression that the plea agreement was contingent on obtaining the approval of the victim's family. That contingency was not satisfied and on December 28 the prosecution advised defense counsel that there would be no deal. The defendant later offered on the record to plead guilty as contemplated by the plea agreement, but the state objected and, accordingly, no guilty plea was entered.[22]

McKenzie contends that the principle of *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), applied by this court in *United States v. Stockwell*, 472 F.2d 1186 (9th Cir.), *cert. denied*, 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973), renders unconstitutional the imposition of a sentence of death on a defendant who would have received a prison sentence had he pled guilty. We are unpersuaded.

*Jackson* struck down the death penalty portion of the Federal Kidnaping Act, 18 U.S.C. § 1201(a). That statute, as construed by the Supreme Court, gave the jury discretion to sentence to death any defendant convicted of violating its provisions, but provided for a maximum sentence of life imprisonment in the event a defendant pled guilty or waived his right to a jury trial. 390 U.S. at 581, 88 S.Ct. at 1216. The Court held that this statute created an unconstitutional burden on a defendant's "Fifth Amendment right not to plead guilty and ... Sixth Amendment right to demand a jury trial," *id.* (footnote omitted), and therefore was unconstitutional because it unfairly coerced guilty pleas and jury waivers. *Id.* at 583, 88 S.Ct. at 1217.

McKenzie's situation is precisely the converse. He would have us hold constitutionally infirm a process that discouraged a guilty plea and jury waiver and encourage him to exercise his constitutional rights. Defendants have no constitutional right to plead guilty to lesser crimes than those charged, *see Mabry v. Johnson*, 467 U.S. 504, 507–08 & n. 5, 104 S.Ct. 2543, 2546–47 & n. 5, 81 L.Ed.2d 437 (1984), or to avoid trial. Therefore, none of McKenzie's constitutional rights were burdened when the state refused to go through with the proposed plea agreement. Moreover, the statutory scheme under which McKenzie was convicted did not provide for differing treatment for those who pled guilty and those who exercised their right to a jury trial. In either case, the full range of sentencing options was available to the sentencing judge. *Jackson* simply does not apply.[23]

---

**22.** In his federal habeas petition, McKenzie claimed that his right to a fair trial was violated when the trial court declined to enforce the plea agreement despite alleged prejudice to the defendant by virtue of the revelation of certain information to the prosecutors in the course of plea negotiations. This contention was rejected by the district court and by the panel that heard the appeal initially. 801 F.2d at 1527–28. While McKenzie did not raise this point in his petition for rehearing, we approve of the panel's resolution of this issue.

**23.** In *Corbitt v. New Jersey*, 439 U.S. 212, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978), the Court upheld a sentencing scheme mandating life sentences upon conviction of defendants who might have received lesser sentences by pleading *nolo contendere* to the same charge, and distinguished *Jackson* on the ground, inter alia, that *Jackson* involved the death penalty, a punishment "'unique in its severity and irrevocability.'" *Id.* at 217, 99 S.Ct. at 496 (quoting *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S.Ct. 2909, 2931, 49 L.Ed. 2d 859 (1976)). McKenzie argues that *Corbitt* supports his position by requiring additional safeguards for defendants who have been sentenced to death. While it is true that this case, like *Jackson*, involves the death penalty, it is also true—and dispositive—that McKenzie's rights not to plead guilty and to have a jury trial

McKenzie's reliance on *Stockwell* is equally misplaced. An examination of the reasoning in *Stockwell* illustrates how inapplicable *Jackson* is to McKenzie's situation. In *Stockwell*, the trial court told the defendant that he would receive one sentence if he agreed to plead guilty and another, longer, sentence if he was convicted after a trial. Defendant elected to go to trial and, after conviction, the judge gave him the promised longer sentence. On appeal, this court explained the application of *Jackson*:

> [O]nce it appears in the record that the court has taken a hand in plea bargaining, that a tentative sentence has been discussed, and that a harsher sentence has followed a breakdown in negotiations, the record must show that no improper weight was given *the failure to plead guilty*. In such a case, the record must affirmatively show that the court sentenced the defendant solely upon the facts of his case and his personal history, and not as *punishment for his refusal to plead guilty*.

472 F.2d at 1187–88 (emphasis added). McKenzie did not refuse to plead guilty; instead, he made an offer on the record to do so. It is therefore impossible to see in what sense the trial court might have desired to "punish" him in violation of *Jackson*. The record discloses without contradiction that the judge sentenced McKenzie based on the facts of the case and his personal history. *See* pp. 1541–42 *infra*.

It is no doubt true that a sentence of death must "be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977) (plurality opinion). That the sentence imposed after trial is more severe than one the judge would have been willing to impose as part of a plea bargain does not, however, impeach the legitimacy of the sentence. In the first place, the judge could well have approved a settlement calling for a sentence lighter than he himself would have chosen to impose. Moreover, in the interval between the plea negotiations and the sentencing proceedings, the trial judge had numerous opportunities to gain additional information upon which to base his sentencing decision. He presided over McKenzie's sixteen-day-long trial; heard the testimony of fifty prosecution witnesses, including witnesses who testified in great detail about the brutality of the crime, McKenzie's apparent premeditation and other aggravating factors; read the presentence investigation report; and, most important, received a unanimous jury verdict finding the defendant guilty beyond a reasonable doubt of two of the most heinous crimes punishable under Montana law.[24]

These facts sufficiently explain the trial judge's decision, and his written findings set out with compelling force the rationale for the sentence he imposed. McKenzie points to no evidence tending to show an alternative, improper, basis for the sentence, and we find no basis for his objections in that regard.[25]

were not in any way burdened. The rule in *Jackson* depends on more than the fact that the death penalty was imposed on a defendant who might have escaped that penalty through a plea agreement. Only when the exercise of constitutional rights is made unduly burdensome does *Jackson* apply.

**24.** The trial transcript, excluding voir dire, is over 2,000 pages long. This fact alone belies appellant's claim that the trial judge "was aware of the facts of Duncan McKenzie's crime well before the hour long meeting where he agreed to impose a prison sentence on his plea." Amended Supplemental Brief of Appellant on Rehearing *En Banc* at 36–37. As support for this counterintuitive assertion, McKenzie relies solely on a portion of the transcript of the

pretrial proceedings indicating that the judge had seen two photographs of Lana Harding's savagely beaten body. *Id.* (citing R.T. at 23–24). This does not come close to raising an inference of capriciousness or vindictiveness in sentencing.

**25.** In his final brief on rehearing, appellant argues that the trial court violated the principle of *Booth v. Maryland*, —— U.S. ——, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), by permitting the wishes of the victim's family "to control Duncan McKenzie's fate." Second Supplemental Brief of Appellant on Rehearing *En Banc* at 18. Although there is no evidence that the trial judge improperly considered the impact of the crime on the victim's family in making his sentence determination, McKenzie contends that merely

### C. Constitutionality of the Montana Death Penalty Statutes

McKenzie challenges the constitutionality of the Montana statutes under which he was sentenced to death.[26] This challenge presents a question of federal constitutional law that we review de novo. *LaDuke v. Nelson*, 762 F.2d 1318, 1322 (9th Cir.1985); *United States v. McConney*, 728 F.2d 1195, 1202–03 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

Procedures for imposing the death penalty must conform to certain guidelines. First, and most fundamentally, the discretion of the sentencer "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (plurality opinion); *see also Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Initially, at the stage of legislative definition, the state must carefully delimit by statute the classes of crimes for which the death penalty is a permissible punishment. *Zant v. Stephens*, 462 U.S. 862, 877–78, 103 S.Ct. 2733, 2742–43, 77 L.Ed.2d 235 (1983). Thereafter, at the sentence selection stage, each defendant convicted of a capital offense must have a full opportunity to present the sentencer with evidence in mitigation of his crime. *Eddings v. Oklahoma*, 455 U.S. 104, 110, 112, 102 S.Ct. 869, 874, 875, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (opinion of Burger, C.J.). This permits the requisite individualized determination of the appropriate sentence in light of all factors relevant to the particular case and defendant. *Zant v. Stephens*, 462 U.S. at 879, 103 S.Ct. at 2744.

The second requirement is that there be review of the sentence by a court of statewide jurisdiction to ensure that the sentence has not been imposed in an arbitrary manner and is not disproportionate to the underlying crime.[27] *See, e.g., Zant*, 462 U.S. at 876, 103 S.Ct. at 2742; *Proffitt v. Florida*, 427 U.S. 242, 253, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976) (plurality opinion); *Gregg*, 428 U.S. at 198, 96 S.Ct. at 2937.

McKenzie raises three arguments in support of his contention that the statutes under which he was sentenced are unconstitutional. First, he asserts that they fail to guide sufficiently the discretion of the sentencer because they do not adequately narrow the class of capital-eligible defendants. Next, he claims that the sentencing procedures employed in his case were ad

---

letting the family influence the decision to bring him to trial introduced an impermissible element of arbitrariness.

The Montana state district court, like trial courts elsewhere, had no power to control the prosecutor's decision whether to plea bargain. To the extent the victim's family's wishes were given any consideration, it was in the decision to take the case to trial, not in sentencing. We see no impropriety in that.

**26.** McKenzie was sentenced pursuant to R.C.M. §§ 94–5–105 and 94–5–304 (1947), which at the time of Lana Harding's death provided:

94–5–105. **Sentence Of Death For Deliberate Homicide.** (1) When a defendant is convicted of the offense of deliberate homicide the court shall impose a sentence of death in the following circumstances, unless there are mitigating circumstances:

(a) The deliberate homicide was committed by a person serving a sentence of imprisonment in the state prison; or

(b) The defendant was previously convicted of another deliberate homicide; or

(c) The victim of the deliberate homicide was a peace officer killed while performing his duty; or

(d) The deliberate homicide was committed by means of torture; or

(e) The deliberate homicide was committed by a person lying in wait or ambush; or

(f) The deliberate homicide was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person.

94–5–304. **Sentence Of Death For Aggravated Kidnapping.** A court shall impose the sentence of death following conviction of aggravated kidnapping if it finds that the victim is dead as the result of the criminal conduct unless there are mitigating circumstances.

**27.** The Constitution does not require that state court review of death sentences include a comparison of sentences imposed in similar cases. *Pulley v. Harris*, 465 U.S. 37, 43–51, 104 S.Ct. 871, 875–80, 79 L.Ed.2d 29 (1984). Such "comparative proportionality review" is merely one additional safeguard against arbitrariness in sentencing. *Id.* at 51, 104 S.Ct. at 880.

hoc and judge-created, lacking the constitutionally required safeguards against arbitrariness in the imposition of death sentences. Finally, he challenges Montana's sentencing review system, at least insofar as it was applied to him.

1. *Sentencing Discretion*

 Under Montana law at the time of Lana Harding's death, the crime of deliberate homicide was punishable by death or imprisonment for a term of years. However, the death penalty was reserved for a specifically enumerated subclass of deliberate homicides.[28] In addition, the death penalty could be imposed for aggravated kidnaping, but only if the victim died as a result of the defendant's criminal conduct.[29] The jury found that McKenzie committed deliberate homicide "by means of torture," one of the six types of homicide punishable by death, and that he also committed aggravated kidnaping. The jury further found that Lana Harding died as a result of the aggravated kidnaping.

McKenzie contends that these statutes are unconstitutional under *Gregg* and *Furman* because they do not contain, in addition to a description of the basic elements of the crime, a list of aggravating circumstances that must be found before death may be imposed in an individual case. This is not so. Under Montana law at the time of McKenzie's crime, there was a large class of deliberate homicides and aggravated kidnapings punishable by imprisonment and only a much narrower class punishable by death. The applicable statutes precisely specified the elements that had to be found in addition to mere deliberate homicide or aggravated kidnaping in order to justify imposition of the death penalty.

McKenzie points out that the information charging him described each crime in a way that essentially included the additional factors as elements of the crime to be considered at the guilt phase of the trial rather than as distinct aggravating factors to be considered at the sentencing phase. This is not constitutionally significant. As the Supreme Court held recently,

> The use of "aggravating circumstances," is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase. Our opinion in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), establishes this point.

*Lowenfield v. Phelps*, — U.S. —, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988). Just as in *Lowenfield* and *Jurek*, the findings required by the Montana statutes—that McKenzie tortured and caused the death of Lana Harding—were adequate to place his crimes within the narrow class of offenses for which the death penalty may be appropriate.[30]

McKenzie also argues that the actual aggravating circumstances found in his case do not "genuinely narrow the class of persons eligible for the death penalty [or] reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877, 103 S.Ct. at 2742. With respect to the circumstance of torture, he relies on *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), which involved a statute that provided for imposition of the death penalty if the murder "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." *Id.* at 422, 100 S.Ct. at 1762. This aggravating circumstance was

---

**28.** R.C.M. §§ 94-5-101, -102, -105 (1947).

**29.** R.C.M. §§ 94-5-303, -304 (1947).

**30.** McKenzie relies on *Collins v. Lockhart*, 754 F.2d 258 (8th Cir.), *cert. denied*, 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985), for the proposition that an aggravating circumstance which is an element of the crime cannot be said

to narrow adequately the class of persons who may be sentenced to death. We read *Collins* as grounded in the peculiar statutory scheme employed by Arkansas to define capital murder. In any event, we note that *Collins* did not discuss *Jurek* and was decided prior to *Lowenfield*. We must, of course, resolve any conflict in favor of *Lowenfield* and *Jurek*.

held not unconstitutional on its face in *Gregg v. Georgia*, 428 U.S. at 201, 96 S.Ct. at 2938. The *Gregg* Court stated that an overly broad reading of that language might not pass constitutional muster, but that a construction that limited it to "torture-murder" would be constitutionally permissible. *Id.*

In *Godfrey*, the Georgia Supreme Court upheld a death sentence based solely on this aggravating circumstance. However, the trial judge in *Godfrey* explicitly found that the victims had not been tortured, and the prosecutor told the jury that no allegations of "torture" or "aggravated battery" were being made. 446 U.S. at 426, 100 S.Ct. at 1763. The Supreme Court vacated the sentence on the ground that the remaining language—"outrageously or wantonly vile, horrible or inhuman"—insufficiently narrowed the class of murderers to whom the death penalty could be applied. *Id.* at 428–29, 432–33, 100 S.Ct. at 1764–65, 1766–67. *Godfrey* therefore does not deal at all with torture as an aggravating circumstance and *Gregg*'s general approval of this type of statute controls.

The homicide statute under which McKenzie was sentenced required a finding that the victim's death was caused "by means of torture." The trial court defined this crime to the jury in clear and explicit terms,[31] and the Montana Supreme Court approved this definition on appeal. *McKenzie III*, 608 P.2d at 445. Far from reading torture out of the statute, as was the case in *Godfrey*, the Montana courts have defined the term in a manner that narrows the class of murderers qualifying for the death penalty and guides the jury in its selection of those persons who fit within that class. *Cf. Barclay v. Florida*, 463 U.S. 939, 968, 103 S.Ct. 3418, 3434, 77 L.Ed.2d 1134 (1983) (Stevens, J., concurring in the judgment) (approving application of aggravating circumstance that crime was "especially heinous, atrocious, or cruel" to case where victim "was knocked to the ground and repeatedly stabbed by [the defendant] as he writhed in pain begging for mercy").

McKenzie's argument as to aggravated kidnaping is no more availing. Under the applicable Montana statute, the jury was required to find that McKenzie kidnaped Lana Harding with specific intent to commit one of five further wrongful acts, and the death penalty could be imposed only if the jury found—as it did—that Ms. Harding died as a result of his criminal conduct. R.C.M. §§ 94–5–303, –304. McKenzie contends that this crime is nothing more than felony murder, and thus is not sufficiently narrow to permit consideration of the death penalty for all persons who are found guilty of committing it. He points to the numerous death sentences for felony murder that were struck down in *Furman* and its companion cases as support for his contention.

McKenzie's reliance on *Furman* and its companion cases is misplaced. None of the statutes at issue there provided for the full panoply of protections against arbitrariness in sentencing that the Supreme Court has held constitutionally required. Moreover, the Supreme Court has upheld the constitutionality of the death sentence for felony murder where the defendant killed, attempted to kill or intended that lethal force be used.[32] *See, e.g., Cabana v. Bullock,*

---

**31.** The jury instructions stated:

Whoever purposely assaults another physically for the purpose of inflicting cruel suffering upon the person so assaulted for the particular purpose of enabling the assailant to either:

 (a) extort anything from such person;

 (b) or to persuade such person against his or her will, or

 (c) to satisfy some other untoward propensity of the assailant,

and in so doing the assailant causes the death of the person he assails, in the law is guilty of the offense of Deliberate Homicide by Means of Torture, whether or not it was the purpose or intention of the assailant to cause such death.

"Untoward Propensity" means any perverse, wrong, bad or corrupt inclination or tendency.

Instr. No. 23, App. at 1559–60; *see also* Add'l Instr. No. 34, App. at 1565.

**32.** As indicated above, the Montana Supreme Court found beyond a reasonable doubt that McKenzie purposely or knowingly killed Lana Harding. *See* note 8 *supra.*

106 S.Ct. at 696–97, 700 (permitting imposition of death sentence if state court first made required findings of culpability in robbery felony murder case); *Jurek v. Texas,* 428 U.S. at 268, 270, 96 S.Ct. at 2955 (kidnaping-rape felony murder); *Gregg v. Georgia,* 428 U.S. at 160–61, 96 S.Ct. at 2919 (aggravating circumstances found were that murders were committed in course of robbery and for the purpose of furthering robbery). Whether denominated felony murder or aggravated kidnaping resulting in death, the crime of which McKenzie was convicted was narrowly defined, and its distinguishing characteristics sufficiently justified imposition of the death penalty.

### 2. *Sentencing Procedures*

▇ In convicting McKenzie, the jury returned written findings of two statutory aggravating circumstances. The sentencing judge approved these findings, concluding that McKenzie committed a "brutal, conscienceless, torture, rape and deliberate killing of a human being," that the murder was committed during the commission of a felony, that the defendant had a prior conviction for a violent crime and was both "dangerous and potentially dangerous," and that rehabilitation of the defendant was impossible.[33] Findings, Conclusions, Sentence and Order of Montana District Court, E.R. 33 (App. V) at 7–9 [hereinafter State Court Findings].

> As the plurality noted in *Jurek,*
> a sentencing system that allowed the jury to consider only aggravating circumstances would almost certainly fall short of providing the individualized sentencing determination that we today have held in *Woodson v. North Carolina,* [428 U.S. 280, 303–05, 96 S.Ct. 2978, 2990–92, 49 L.Ed.2d 944 (1976),] to be required by the Eighth and Fourteenth Amend-

ments.... A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed.

428 U.S. at 271, 96 S.Ct. at 2956.

Sections 94–5–105 and 94–5–304 of the Montana Code satisfied this requirement at the time Lana Harding was killed. Both sections provided that, upon a defendant's conviction of a capital offense, the "court shall impose [a] sentence of death ... unless there are mitigating circumstances." McKenzie does not deny that the statutes required consideration of mitigating circumstances, or that he was given a full opportunity to present evidence on this issue to the sentencing judge. Instead, he complains that the death penalty statutes themselves did not contain explicit procedural mechanisms for fulfilling this requirement.

Before passing sentence on McKenzie, the trial court ordered and considered a presentence investigation report, as required by R.C.M. § 95–2203 (1947). By statute such reports must include "the characteristics, circumstances, needs, and potentialities of the defendant; his criminal record and social history; [and] the circumstances of the offense." *Id.* § 95–2204. The Montana Supreme Court construed these provisions together to find that Montana law required trial courts to consider all mitigating circumstances contained in the presentence report or offered by the defendant. *McKenzie III,* 608 P.2d at 450.

The trial court followed this procedure, offering McKenzie a presentence hearing on mitigating facts and circumstances. State Court Findings at 5–6. McKenzie declined to offer any evidence in mitigation at or before sentencing, but he did file a post-trial Petition and Motion in Mitigation in which he raised several potentially miti-

---

**33.** McKenzie objects to the sentencing judge's consideration of non-statutory aggravating factors. The Montana Supreme Court approved this procedure, however, and it does not violate the Constitution. Reliance on non-statutory aggravating circumstances is permissible so long as the statutory sentencing scheme requires that at least one statutory aggravating circumstance

be found before a death sentence may be imposed. *Barclay,* 463 U.S. at 956–58, *id.* at 966–67, 103 S.Ct. at 3428–29; *id.* at 3433–34 (Stevens, J., concurring in the judgment); *Zant,* 462 U.S. at 878–79, 103 S.Ct. at 2743–44. Montana's sentencing procedures met this requirement. *See* pp. 1539–41 *supra.*

gating factors, inter alia, his mental condition, age, upbringing, social relations and family ties. E.R. 5, H.Exh. 37, Rec. 14 at 3–4. After considering the evidence presented at trial and the presentence investigation report, the trial judge rejected defendant's arguments and found that there were no mitigating circumstances. State Court Findings at 7.

■ McKenzie argues that, since Montana's death penalty statutes did not expressly call for a second hearing on mitigating circumstances, the Montana courts' after-the-fact reading of the law to require such an approach is constitutionally inadequate.[34] He relies on *United States v. Harper*, 729 F.2d 1216 (9th Cir.1984), which struck down the death penalty provision of the Espionage Act, 18 U.S.C. § 794 (1982), despite the district judge's willingness to supply the restrictions on sentencing discretion that were wholly absent from the statute itself. *Harper* held that judicial construction could not save the statute because *Furman, Gregg* and their progeny require sentencing guidelines to be formulated by the legislature at the definitional stage, not by courts at the sentencing stage. *Id.* at 1225–26.

*Harper* is clearly distinguishable. The Montana statutes do channel the discretion of the sentencer, first by delineating narrow subclasses of deliberate homicide and aggravated kidnaping for which the death penalty may be considered, and second by requiring consideration of mitigating circumstances before a sentence of death may be imposed. That the death penalty statutes do not themselves explicitly set out the process by which mitigating circumstances are to be considered is of no consequence. The Montana Supreme Court construed state law to require presentation and consideration of all mitigating factors, including all such evidence contained in the presentence report, and the trial judge provided McKenzie a full opportunity to present such evidence.

In *Jurek v. Texas* the Supreme Court approved a sentencing statute that did not expressly provide for full consideration of mitigating circumstances. 428 U.S. at 272–76, 96 S.Ct. at 2956–58. Instead, the Texas statutes required a post-conviction hearing where the jury determined, inter alia, whether the defendant was likely to commit violent criminal acts in the future. Because the Texas appellate courts interpreted the statute to require consideration of all mitigating circumstances at this hearing, the Supreme Court found the statutory scheme constitutional as construed by the Texas courts. If a death penalty statute that fails to provide explicitly for consideration of mitigating circumstances can be saved by judicial construction, a fortiori the Montana Supreme Court's interpretation of Montana sentencing procedures suffices to remedy any defects that may have existed on the face of the statute.[35]

### 3. Sentence Review

■ McKenzie also argues that Montana's sentencing scheme failed to provide adequate opportunity for appellate review of death sentences, and that the review he received in the Sentence Review Division of

**34.** At the sentencing stage, McKenzie's counsel had no doubts about whether Montana law permitted defendants an opportunity to present mitigating factors to the sentencer. McKenzie's Motion in Mitigation states: "It is generally understood that any person has the right to present matters in mitigation of sentence.... The Court herein has advised Defendant that it is receptive to, and will hear, any matter in mitigation...." E.R. 5, H. Exh. 37, Rec. 14 at 2. The motion requested that a lesser sentence be imposed based on the alleged mitigating circumstances. *Id.* at 5.

**35.** *Harper* correctly notes that the Supreme Court has explicitly required *statutory* aggravating circumstances in a death sentencing scheme.

McKenzie apparently reads *Harper* as requiring similar explicit statutory provisions for consideration of mitigating circumstances, including detailed procedures for implementing this review. Such a reading of *Harper* would, of course, conflict with *Jurek*. We therefore decline to so interpret *Harper*. *See generally Campbell v. Kincheloe*, 829 F.2d 1453, 1464–65 & n. 7 (9th Cir.1987) (upholding constitutionality of state death penalty statute as construed by state supreme court, despite defendant's claim that judicial construction cannot cure defective statute; *Harper* distinguished on the ground that the Espionage Act "provided no guidance to the sentencing authority at all").

the Montana Supreme Court (SRD) was ad hoc, standardless, improvised and fashioned solely for his case. This is not so.

All persons convicted of crimes under Montana law are entitled to direct review by the Montana Supreme Court. R.C.M. §§ 95–2401, –2404, –2405(a) (1947). The filing of a notice of appeal automatically stays execution of a sentence of death pending final resolution of the appeal. *Id.* § 95–2406(a). The state supreme court receives the full record on appeal,[36] *id.* § 95–2408, and has full power to set aside or modify the judgment or sentence of the trial court. *Id.* § 95–2426. The supreme court itself reviews all legal issues relating to the trial and the sentence imposed, while the SRD reviews the appropriateness of the sentence. *McKenzie III,* 608 P.2d at 450.

The Montana Supreme Court exhaustively considered and rejected McKenzie's claims of error on four separate occasions. On McKenzie's first appeal, the supreme court also reviewed the full record in his case to determine whether the sentence was influenced by passion, prejudice or other arbitrary factors, whether the finding of aggravating circumstances was supported by the evidence, and whether the sentence was proportionate to those imposed in similar cases. *McKenzie I,* 557 P.2d at 1034. Subsequently, after *McKenzie II* was decided, McKenzie was permitted to have his sentence reviewed by the SRD to determine whether it was appropriate in light of all the circumstances. It is this latter review that is the primary focus of McKenzie's objections.

Far from being an ad hoc, extraordinary form of review, appeal to the SRD was clearly available to McKenzie under the law of Montana: *"Every sentence* shall be subject to review in accordance with chapter 25 [establishing the SRD]." R.C.M. § 95–2211 (1947) (emphasis added) (re-

pealed 1977); *see also id.* § 95–2502. This procedure had been invoked several hundred times by defendants before McKenzie. *See State v. Henrich,* 162 Mont. 114, 509 P.2d 288, 291 (1973). In reviewing sentences, the SRD is empowered to receive copies of presentence reports and other relevant documents, a power exercised in reviewing McKenzie's sentence. R.C.M. § 95–2503 (1947); Decision of the SRD, E.R. 33 (App.U). The Montana Supreme Court has interpreted the SRD's primary function to be "determin[ing] the appropriateness of the sentence with respect to the individual offender and particular offense." *McKenzie II,* 581 P.2d at 1229.[37] The SRD fulfilled this function in McKenzie's case. In short, McKenzie received a full and fair review of his sentence and conviction, as required by Montana law and the eighth and fourteenth amendments.[38]

Montana's death penalty sentencing scheme required a finding of aggravating circumstances before the death penalty could be considered for a particular crime, and required consideration of mitigating circumstances before it could be imposed. It provided procedures by which evidence relating to these issues could be presented to the sentencing authority, and mandated two forms of review by courts of statewide jurisdiction. The Constitution requires no more.

## CONCLUSION

The district court's dismissal of McKenzie's petition for writ of habeas corpus is AFFIRMED. Parts II.A. and II.C. of the panel opinion in this case are VACATED.

FLETCHER, PREGERSON, CANBY and NORRIS, Circuit Judges, dissenting:

The thrust of the majority's opinion is (1) to stress the hideousness of the crimes; (2)

---

**36.** Indigent defendants are entitled to have the state provide them a transcript of the trial proceedings for purposes of appeal. R.C.M. § 95–2428 (1947).

**37.** There need be no express statutory description of the type of review to be undertaken by the appellate court. The Constitution requires only that such review be available, and that reviewing courts consider the appropriateness

of the sentence in light of all the circumstances. *See Pulley,* 465 U.S. at 53, 104 S.Ct. 880.

**38.** In addition to direct appeal to the supreme court and the SRD, Montana law provides for collateral review of convictions, a procedure of which McKenzie also availed himself. *See* R.C.M. §§ 95–2601 *et seq.; McKenzie IV,* 640 P.2d at 371.

to stress the few instructions that standing alone would withstand constitutional muster; and (3) to weave a tortured path through the instructions that the jury *might* have followed to find a verdict untainted by the numerous instructions [1] that concededly placed an unconstitutional burden of proof on the defendant and served to confuse rather than instruct the jury.

The dissent disagrees on two principal bases. First, the instructions were so flawed that the defendant could not have had a fair trial. Harmless error analysis is simply inappropriate in such a case. The instructions in this case are so bad that even the prosecution at trial objected to their use and requested that alternatives be read in their place. They are instructions that the counsel for the State at the *en banc* oral argument admitted were in some respects the worst he had ever seen. Justice Shea of the Montana Supreme Court called the instructions "the most confusing and inconsistent set of instructions I have ever seen." *McKenzie v. Osborne*, 195 Mont. 56, 640 P.2d 368, 411 (1981) (Shea, J., dissenting). Because only a complete reading of the instructions will illustrate fully the extent to which they deviate from fair and comprehensible instructions, we append the full text to the end of this dissent. We suggest that the readers of this opinion turn first to the instructions in order to appreciate the dissent's profound disagreement with the approach the majority embraces.

Second, however, if the majority must be met on its own terms, the errors were not harmless.

## BACKGROUND

McKenzie was convicted of one count of deliberate homicide "by means of torture" and one count of aggravated kidnapping. Both offenses require the jury to find that the defendant acted "knowingly and purposely," [2] *and* that he acted with a particular purpose. Repeatedly, the jury instructions given at his trial directed the jury to *presume* that he had the mental states of acting "knowingly or purposefully," upon finding that the defendant performed the physical acts. As conceded by the State and the majority, because the instructions shifted the burden of proof to the defendant, they violated the due process clause of the fourteenth amendment. *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

No one challenges the fact that McKenzie committed the dreadful acts. His intent was the issue at trial. His defense was mental incapacity—an inability to form the requisite criminal intent. The concepts that the jury needed to understand in order to determine whether McKenzie had the requisite criminal intent are subtle and difficult. Those trained in the law find them confusing; laypersons must find them doubly so. Insanity and diminished capacity are distinct conditions, similar but different. The defendant who asserts insanity as a defense has the burden to establish it by a *preponderance of the evidence*. If defendant's claim, however, is diminished capacity that precludes him from forming the requisite criminal intent, once he has raised a genuine issue in this regard, the *state* must prove that he had the mental capacity to form the requisite intent *beyond a reasonable doubt*. To convict

---

1. In the twenty-five "additional" instructions read to the jury at the end of trial—and immediately before its deliberations—there were perhaps as many as *fourteen* unconstitutional presumptions.

2. In fact, "Homicide By Means of Torture" is not an actual offense in Montana. Torture is not a statutory element of any offense; rather, it is relevant only to punishment. McKenzie was actually charged with two counts of deliberate homicide. One required for a finding of guilt that he caused death "knowingly or purposefully." The other, a felony-murder provision, did

not. Neither included a particular purpose requirement like the one used in the judge's torture instructions. It is unclear which count the jury used to find McKenzie guilty. The jury verdict merely states that McKenzie was guilty of deliberate homicide. A box on the verdict form stating "by means of torture" was checked. Further, the judge instructed the jury that for McKenzie to be guilty of deliberate homicide by means of torture, McKenzie did not need to have the specific intent to cause death, so long as he "knowingly or purposefully" tortured for one of the particular purposes. Instr. 23.

McKenzie, the jury had to find not only that, beyond a reasonable doubt, he had the general criminal intent to commit the criminal acts (that he did them "knowingly or purposefully,") but that he acted with particular purposes in mind. The jury needed to understand that general and specific intent are distinct and different, and that a defendant could possess one without the other. It needed to understand that although it could *infer* intent from the evidence, it could not *presume* it, and that although it could presume sanity, it could not presume intent. Obviously, it needed to understand the meaning of "infer" and "presume." Adequate jury instructions would have to convey these concepts in a manner that a reasonably intelligent jury could comprehend.

## FUNDAMENTAL FAIRNESS

McKenzie's due process right to be convicted upon proof established beyond a reasonable doubt, and his sixth amendment right to a trial by jury have been violated. Upon the facts of this case, harmless error analysis is wholly improper.

The purpose of the requirement of proof beyond a reasonable doubt is to ensure that only the truly guilty are convicted. It reflects an age-old tradition that it is better that a guilty person go free than that an innocent one be punished. *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986). The Supreme Court has suggested that the requirement is so fundamental to our notion of fairness that the failure to instruct the jury that the state must prove its case beyond a reasonable doubt can never be harmless. *Id.* 106 S.Ct. at 3107 n. 8 (citing *Jackson v. Virgi-*

*nia*, 443 U.S. 307, 320 n. 14, 99 S.Ct. 2781, 2790 n. 14, 61 L.Ed.2d 560 (1979)).

Also central to our system of criminal justice is the right to a trial by jury. *See generally id.* at 3114 (Blackmun, J., dissenting). The jury's fact-finding role is protected from all interference. *Id.* Accordingly, when a trial error has affected the jury's deliberative processes, a court may apply a harmless error analysis only where the error had no effect on the outcome. *Id.* at 3108 n. 11; *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) (constitutional errors may be harmless "in terms of their effect on the factfinding process at trial"). Thus, a directed verdict on an element of the offense in favor of the state can never be harmless. *See Connecticut v. Johnson*, 460 U.S. 73, 84, 103 S.Ct. 969, 976, 74 L.Ed.2d 823 (1983) (plurality opinion); *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572–73, 97 S.Ct. 1349, 1355–56, 51 L.Ed.2d 642 (1977). But *Sandstrom* error, or an incorrect statement of what standard against which to judge predicate facts, *Pope v. Illinois*, —— U.S. ——, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987), may be harmless because such instructions do not necessarily remove the issue from the jury.[3]

Before we may apply the harmless error analysis, we must decide whether "placed in context," *Rose*, 106 S.Ct. at 3107, the instructions in the case were so egregious as to render the trial "fundamentally unfair," *Pope*, 107 S.Ct. at 1922, by preventing the jury from performing its constitutionally mandated function of determining guilt beyond a reasonable doubt. We conclude the trial was fundamentally unfair.

---

**3.** *Rose* relies on the fact that intent, unlike other elements of a crime, may only be proved through circumstantial evidence, which includes predicate acts. Otherwise properly instructed, the jury properly finds the predicate acts. Unless the defendant interposes a viable defense to the intent element, an instruction on intent is superfluous.

*Pope* is somewhat different. An obscenity case, *Pope* relies on the fact that the jury *considered* the element of the magazine's "value," even though it judged the value by reference to

the wrong community's standard. As in certain cases involving *Sandstrom* error, in *Pope*, the jury may have found predicate acts upon which the reviewing court could build in finding beyond a reasonable doubt that the jury would have found guilt under the proper standard. The same construct cannot be built in reviewing an instruction to the jury using an improper standard of review. *Jackson* thus continues as sound authority after *Pope*. *Contrast Pope*, 107 S.Ct. at 1922 n. 7.

This is not a case involving an isolated instruction tainted by *Sandstrom* error. The unconstitutional instructions were "multiple" (as the majority notes), restated in a variety of formulations, and mutually reinforcing.

The following excerpts from the jury instructions are representative of those containing *Sandstrom* error.[4]

Instruction 31 ("Mental State—Methods of Proof") describes the differences between inferences and presumptions. It states:

> The knowledge or purpose with which an act is committed being a mental state, is incapable of being proved by direct evidence, and proof thereof is permitted by indirect or circumstantial evidence, which means proof by rules of law, denominated inferences and presumptions.

> . . . .

> A presumption is a deduction or reasoning which the law *expressly directs* a jury make from proved fact or facts; while an inference is a deduction or reasoning which the law permits or allows the jury to draw from the fact or facts proved.

> Presumptions *expressly direct* you to reason from proved facts.

> Inferences permit you to reason from proved facts.

(Emphasis added.) To illustrate the use of presumptions, the instruction goes on to offer the following example:

> 2. *Proof by Presumption of Law* (Deductions which the law *expressly directs* to be made from particular facts):

> The witness heard a cry for help. He immediately looked out of a window and saw only two men; "A" holding a board and standing over the body of "B" who was unconscious on the ground and with his head bleeding. Other evidence was introduced to show that the board then held by "A" had blood on it which was the same type as "B's" blood and evidence was introduced that "B" had been struck on the head three times by the board to show that the striking was not accidental. No evidence was introduced as to a motive for "A's" striking "B" and no evidence of threats by "A" against "B" was introduced.

> If the jury believes the witness and the other evidence introduced they are permitted to deduce or reason that "A" struck "B" over the head with the board intentionally and for the purpose of injuring him but in addition thereto *the law presumes, that is, the law expressly directs the jury to reason: That an unlawful act was done with an unlawful intent and also that a person is presumed to intend the ordinary consequences of his voluntary act.*

> Having found that "A" struck "B" over the head with a board three times, intentionally (absent any evidence that the act was in self defense by "A"), "A's" act was unlawful and *the jury is expressly directed to reason that "A" struck "B" with an unlawful intent; that is, knowingly or purposely and is further expressly directed to reason that he intended to inflict the injuries that ordinarily result from such an act.*

> There are other legal presumptions besides those referred to in the foregoing illustration and you will be instructed with particularity as to the use of inferences and presumptions as they may have application to each Count with which the defendant is charged.

> Further, unless you are otherwise instructed with regard to a particular presumption, all presumptions are rebuttable; that is, they may be controverted and overcome by other evidence.

(Emphasis added.)

The *Sandstrom* errors continue in Instructions 33 ("Method of Proof Applicable to the Offense of Deliberate Homicide"), 35 ("Method of Proof Applicable—Kidnapping"), 37 ("Methods of Proof Applicable to

---

4. A full explication of the jury instructions is beyond the scope of this dissent. For a thorough explication, see Justice Shea's thoughtful dissent in *State v. McKenzie,* 608 P.2d 428, 462–86 (1980). Also *see* appendix to this opinion.

Sexual Intercourse Without Consent"), and 38 ("Methods of Proof Applicable to the Offenses of Aggravated Assault"). Instruction 33 states:

(1) *If you find beyond a reasonable doubt that the defendant,* on or about January 21, 1974, in Pondera County, Montana, *voluntarily committed an illegal act* on Lana Harding, such as assaulting or injuring her, *the law presumes that an unlawful act was done with an unlawful intent; that is, the law expressly directs you to reason from such unlawful act that the defendant acted with an unlawful intent, or purpose.*

This is a rebuttable presumption, which means it may be controverted and overcome by other evidence, but whether or not a presumption, once it has come into effect is overcome, is for the jury to determine.

(2) *The law also presumes that a person intends the ordinary consequence of his voluntary act.*

*Therefore, if you find beyond a reasonable doubt that the defendant,* on or about January 21, 1974, in Pondera County, Montana, *voluntarily and unlawfully assaulted or injured Lana Harding, and if you further find beyond a reasonable doubt that the death would result as the ordinary consequence of such an assault or injury, the law presumes that, and expressly directs you to reason therefrom that the defendant intended to cause said death regardless of whether or not he actually had such an intent or purpose.*

This also is a rebuttable presumption capable of being controverted and overcome, but once it has come into effect it is for the jury to determine whether or not it has been rebutted.

. . . .

(Emphasis added.)

Instruction 35 states:

. . . .

*If you find beyond a reasonable doubt that the defendant,* on or about January 21, 1974, in Pondera County, Montana, *without lawful authority, restrained Lana Harding,* either by secreting her in a place of isolation, or by using physical force, or by threatening to use physical force to hold her, *the law presumes that he acted therein with an unlawful intent, purpose or knowledge, and expressly directs you to so reason.*

This presumption in law that an unlawful act was done with an unlawful intent is as you have heretofore been instructed, a rebuttable presumption subject to being controverted and overcome by other evidence as you may find the evidence to be.

(Emphasis added.)

Instruction 37 states:

. . . .

Since the offense of sexual intercourse without consent does not require that the act be done purposefully or for a particular purpose and may be proved by showing the act was knowingly done, *proof of such mental state can be made by presumption.*

Therefore, since *the law presumes that an unlawful act was done with an unlawful intent* if you reason from facts proved beyond a reasonable doubt that the defendant ... had sexual intercourse with Lana Harding who was not his wife, and without her consent, *you are expressly directed to reason therefrom, that he did so knowingly,* and you may find therefrom beyond a reasonable doubt that he committed said offense as charged.

This presumption that an unlawful act was done with an unlawful intent is a rebuttable presumption subject to being controverted and overcome as you may find the evidence to be.

(Emphasis added).

Finally, Instruction 38 states:

. . . .

Since the offense of aggravated assault may be committed either knowingly or purposely, the offense may be proved by showing the act was knowingly done, and *the legal presumptions that: "An unlawful act was done with an unlawful intent, and the legal presumption that a person is presumed to intend the ordinary consequences of his voluntary act," can be used to prove the mental state of knowingly.*

Therefore, if you reason from facts proved in the evidence beyond a reasonable doubt that the defendant on or about the 21st day of January, 1974, in Pondera County, Montana, unlawfully caused Lana Harding bodily injury either with or without a weapon, *the law expressly directs you to reason therefrom that he acted with unlawful intent that is purposely;* and if you further reason from facts proved beyond a reasonable doubt that the harm inflicted by him was such as ordinarily results from an act such as defendant's, *the law expressly directs you to reason that he intended the consequences of his act.*

These presumptions "that an unlawful act was done with an unlawful intent" and "A person is presumed to intend the ordinary consequences of his voluntary act", are both rebuttable presumptions, each being subject to being controverted and overcome by other evidence as you may find the evidence to be.

(Emphasis added).

The majority attempts to downplay the egregiousness of the *Sandstrom* errors by suggesting that reading all of the instructions together makes it plain the presumptions were rebuttable. *Ante* at 1529–30 n. 4. But stating that a presumption is rebuttable does not cure the error. The presumption still impermissibly shifts the burden of proof to the defendant. *See Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344 (1985).

Further, the instructions as a whole were long (forty-eight pages), convoluted, confusing, and contradictory. *See United States v. Patel,* 762 F.2d 784, 790 (9th Cir.1985) ("Instructions in a criminal case must be unmistakably clear...."). For example, McKenzie was initially charged with seven counts, each of which could result in a finding of guilt through myriad alternatives. "All told, defendant is charged with committing the crimes in at least seventeen alternative ways." *State v. McKenzie,* 608 P.2d 428, 470 (1980) (Shea, J., dissenting).[5] The jury was told that an unsound mind could be established both upon a reasonable doubt and upon a preponderance of the evidence. The examples are nearly endless. For example, Instruction 33 begins:

> The mental state accompanying the voluntary act required for the offense of deliberate homicide being either knowingly or purposely and not requiring in addition thereto that the act be committed for a particular purpose, proof of the mental state may be made by the use of either inferences or presumptions, or by the use of both inference and presumptions.

With regard to "particular purposes" the jury was first instructed that "[w]hen a particular purpose is an element of an offense, the element is established although such purpose is conditional, unless the condition negatives the harm or evil sought to be prevented by the law defining the offense." Instr. 7. Later the jury was instructed:

> In offenses which require proof of a particular purpose the particular purpose required may never be proved by means of legal presumptions, but must be proved by means of inferences only. In this case, the offenses of: Deliberate Homicide by Means of Torture and Aggravated Kidnapping all require proof that the defendant committed the partic-

---

5. This raises another constitutional problem. The jury was never specifically instructed that it must reach a unanimous decision based on a single path, rather it was told only that "all twelve jurors must agree to the decision, includ-

ing the additional findings you are asked to make." Instr. 54. These instructions violated McKenzie's sixth amendment right to a unanimous verdict. *United States v. Payseno,* 782 F.2d 832, 834–37 (9th Cir.1986).

ular act charged for a particular purpose, in addition to proof that he committed said act either knowingly or purposely. Instr. 32. Defense counsel aptly characterized the nature of these instructions when he wrote: "The premise that the 'presumptions' played no part in [the jury's implicit findings of 'particular purposes'] ... credits the jury with a superhuman ability to parse out the confusing and conflicting instructions in this case and apply a law professor's precision to the use of the words 'presume' and 'infer.'"

The instructions were so confusing that the jury had no clear direction as to how to distinguish the different intents it must find, the burdens of proof involved, or the distinction between sanity and mental capacity. Instruction 30 advised the jury that "the defendant is presumed to have been free from any disease or defect of the mind which excludes responsibility for his conduct...." Instr. 30. It drew no distinction between insanity and diminished capacity, nor did it define the limits of "mental accountability," nor did it specify what showing by the defendant would overcome this presumption. It said simply that a defendant is presumed free from any disease or defect. Since some of the particular purposes could have been viewed by the jury as involving an intent requirement, instruction 30 could have had an impact on the particular purpose instructions. *See Francis v. Franklin,* 105 S.Ct. 1965, 1972–77 (1985) (involving a similar "sound mind" instruction).

The majority suggests that instruction 30 "[t]aken in context," refers only to the defendant's responsibility for his conduct. The "context" the majority has in mind is instruction 53, which the majority insists makes clear that the defendant's capacity to form a mental state is distinct from his legal responsibility. To say the least, this reading is strained. Instruction 53, though it speaks generally to mental accountability, says nothing specific about diminished capacity, the difference between it and insanity, or—most important—the vastly different burdens of proof attaching to each. The only elaboration of mental capacity the majority could identify appears in the last sentence of instruction 53:

"If you find beyond a reasonable doubt that the defendant did do said acts ... you must then consider whether or not the defendant has overcome the presumption of accountability and whether or not he has created a reasonable doubt in your minds as to his mental accountability and responsibility for any of the acts you may find he committed, and whether or not he could have had the requisite mental state for the act...."

Instr. 53. The "presumption" referred to is defined in the previous paragraph of the instruction as being rebuttable "by a preponderance of the evidence." The "mental state," the jury had been told at least eight times, it could presume. The use of the conjunction "and" between the mention of accountability and mental state perhaps has persuaded the majority that the two issues could be separated in the jurors' minds. This seems doubtful.

It is hard to share the majority's certitude that instruction 53 adequately narrowed instruction 30 so that the latter applied only to responsibility and that the jury would so understand it. Instruction 53 nowhere refers to instruction 30, and nowhere clarifies the distinction between insanity and diminished capacity. The majority opinion supposes that the jury not only managed the unlikely logical link between instructions 30 and 53, but also succeeded in divining from instruction 53's Byzantine locution the oblique legal nuances that separate insanity from capacity. At the same time, the majority confidently assures us that no reasonable juror would have followed so "tortured" a chain of thought as to pay attention to one improper instruction (Instr. 36) over another (Instr. 37) immediately adjacent to it and flatly contradicted by it.

Nor were the many unconstitutional errors mitigated by a clear instruction that the jury must find every element of an offense beyond a reasonable doubt. *Rose,* 106 S.Ct. at 3107. Although such an instruction was given, it was read to the jury only at the beginning of the trial. Further,

it authorized a finding of guilt upon "an abiding conviction to a moral certainty," language that has been condemned for suggesting a jury may rely on emotion rather than the facts in rendering a decision. *See United States v. Drake*, 673 F.2d 15, 21 (1st Cir.1982) (condemning language, but finding instructions as a whole to have fairly apprised the jury of reasonable doubt standard). It also did not include an explanation of "doubt" that may arise from the lack of evidence supporting the charges. Only passing references to the prosecution's burden of proof were contained in the instructions given following the trial. *See United States v. Ruppel*, 666 F.2d 261, 274 (5th Cir.) (citing *ABA Advisory Committed on the Criminal Trial, Trial by Jury* 116–18 (1968)); 8A Moore's Federal Practice ¶ 30.02 at 30–5 (2d ed. 1981) (district judge should have repeated presumption of innocence instruction at end of trial, although finding harmless error), *cert. denied*, 458 U.S. 1107, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982). Instead, the instructions given after the evidence was presented, including the many directing the use of presumptions, tended to emphasize the defendant's guilt over his innocence.

The instructions were inflammatory. The use of presumption and inference was illustrated by examples replete with violence and blood. The judge read the information to the jury without a cautionary instruction. *See United States v. Long*, 706 F.2d 1044, 1056 (9th Cir.1983) (finding no error because jury was cautioned). He referred repeatedly to the specific allegations against the defendant. In one instruction, he chose to use the word, "kill," rather than the statutory phrase, "cause the death of," over the objection of the defendant. Instr. 34.

This is not a case like *Sandstrom, Francis, Rose* or *Pope*, each of which involved only *one* unconstitutional instruction.[6] Here, the violations were scattered throughout 48 pages of instructions. Many of the jury instructions contained more than one violation. The effect was a constant drumbeat that directed the jury to presume criminal intent.[7] The errors raise grave doubt about the jury's ability to perform a fair fact-finding function. Unlike cases containing a single tainted instruction, the instructions in this case do not provide the possibility to a reviewing court to excise and isolate the bad and find that the jury would have returned a verdict of guilty even if the jury had never heard the bad instructions. The whole process was infected. *See Chapman v. California*, 386 U.S. 18, 22–23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967). The application of the harmless error test to a case such as this is in a very real sense unprecedented.[8]

A criminal defendant is entitled to a fair trial, not a perfect trial. *Delaware v. Van Arsdall*, 175 U.S. 673, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). This defendant had neither. While the court may and, indeed, should ignore minor, non-substantive errors, which may be inevitable in a long or complicated trial, "[o]ur duty to search for constitutional error with painstaking care is never more exacting than in a capital case." *Burger v. Kemp*, —— U.S. ——, 107 S.Ct. 3114, 3121, 97 L.Ed.2d 638 (1987). Reviewing the circumstances of Duncan McKenzie's trial, one Justice of the Montana Supreme Court called the trial a "mockery" and a "travesty." *McKenzie v. Osborne*, 640 P.2d 368, 436 (Mont.1981) (Morrison, J., dissenting). Another stated: "Never in the annals of criminal law history in this State has a defendant ever been

---

6. *See Sandstrom,* 442 U.S. at 513, 99 S.Ct. at 2453; *Francis,* 105 S.Ct. at 1973; *Rose,* 106 S.Ct. at 3107; *Pope,* 107 S.Ct. at 1922.

7. Justice Shea of the Montana Supreme Court concluded that unconstitutional presumptions so "permeated" the jury charge that for nearly every count of the indictment, there was a corresponding *Sandstrom-*violative instruction. *State v. McKenzie,* 608 P.2d 428, 470 (Mont. 1980) (Shea, J., dissenting).

8. Our court in a recent case, in reversing a conviction, stated "one consideration is whether as a whole [the instructions] were misleading or inadequate to guide the jury's determination." *United States v. Washington,* 819 F.2d 221, 226 (9th Cir.1987). "[A] conviction should not rest on ambiguous and equivocal jury instructions on a basic issue." *Id.*

the victim of such a consistent and wholesale denial of fundamental rights." *Id.* at 434 (Shea, J., dissenting).

Everyone agrees that the trial court's instructions to the jury were riddled with *Sandstrom* errors. These errors occurred in the context of confusing and incoherent instructions—instructions that provide a mass of information with no apparent structure. The errors touched every question asked the jury and every route it might have taken to answer them. To permit these convictions and this sentence to stand in the face of these instructions, would be a fundamental miscarriage of justice.

## HARMLESS ERROR ANALYSIS

Even if harmless error analysis were appropriate in this case, we vigorously disagree with the majority's assertion that beyond a reasonable doubt the verdict was unaffected by the numerous unconstitutional instructions.

The majority approaches its harmless error analysis in a manner different from that employed in *Pope* and *Rose*. Although it acknowledges the *Pope–Rose* approach, in essence, the majority advances the argument that, *in fact*, the jury did *not* rely on the improper instructions. It asserts that the jury found that McKenzie committed the underlying acts with particular purposes in mind without relying on any presumptions, but rather relying on the instructions that required that they infer the particular purposes. The jury, it asserts, would then necessarily have found general intent without needing to rely on the unconstitutional presumptions. Under *Rose* and *Pope*, by contrast, we must *disregard* what the jury actually did and, instead, consider whether the jury, if it had never heard the erroneous instructions, nonetheless, beyond a reasonable doubt, would have convicted the defendant.

We feel constrained first to challenge the majority's assertion that, beyond a reasonable doubt, the jury *in fact* did not rely on the constitutionally infirm instructions in reaching its verdict. Second, using the analysis mandated by *Rose* and *Pope*, we

make clear why our court, as the reviewing court, cannot determine beyond a reasonable doubt that the jury would have convicted McKenzie even if it had never heard the flawed instructions.

What the jury had to decide was whether McKenzie had the mental capacity to form the requisite criminal intent and to perform the acts with the particular purposes in mind. The fact that McKenzie committed the predicate acts was never in doubt, so the question before the jury was whether he had the various intents. The crucial evidence to be considered by the jury was the testimony of both sides' experts in psychology and psychiatry. We summarize the testimony.

Dr. Wetzler, the defense psychiatrist, testified that, based on his interviews with McKenzie, his experience, and his knowledge, he had concluded that McKenzie was incapable of forming the mental states that are elements of the crimes charged. The State produced a psychiatrist and a psychologist who found that McKenzie suffered from a personality disorder, but disagreed that he could not have formed the requisite mental states.

Dr. Wetzler heads the Spokane Psychiatric Clinic and is Chief of Staff of a psychiatric hospital in Spokane. After five years in an accredited residency program, he became Board certified in psychiatry and neurology. During World War II, Dr. Wetzler worked in a five-hundred bed neurological and psychiatric unit, in which he treated primarily soldiers returning from overseas. In addition to being a Fellow of the North Pacific Branch of the American Psychiatric Association, he was President of the Eastern Washington State District Branch of the American Psychiatric Association. Dr. Wetzler teaches forensic psychiatry at Gonzaga Law School and consults for such agencies as the Department of Labor and Industries, the Selective Service, and the Social and Health Services. He is one of the founders of the Spokane County Medical Health Center. On cross-examination, Dr. Wetzler admitted that his wife is a first cousin of McKenzie's trial counsel.

1552

Dr. Wetzler testified that his evaluation was based on eight hours of tapes and two interviews with the defendant, one lasting six hours and the other between four and six hours. During the interviews, he listened to McKenzie's complaints and his background and observed his body language. He did not administer psychological tests or an electroencephalogram, because he did not feel they were necessary. He did not ask about the incident for which McKenzie was charged, but testified he would not change his diagnosis upon learning how the defendant allegedly acted during and immediately after it.[9]

Dr. Wetzler's diagnosis was that McKenzie had a personality trait disturbance, specifically a schizoid personality. Dr. Wetzler concluded that because of his mental defect, McKenzie was incapable of forming the requisite mental states.

Dr. Garcia, testifying for the State, is a staff psychiatrist at the Warm Springs State Hospital and is Director of a continuing treatment service clinic. After a one-year internship from 1955 to 1956, he worked in a number of hospitals, and participated in seminars and symposiums, until coming to Warm Springs in 1961. He was Clinic Director of the Warm Springs Hospital for about ten years and Director of the Mental Hygiene Clinic in Butte, Montana for two years. A member of the Montana committee for the care of the elderly, he wrote the committee's published report that was submitted to the Governor. He has also written a number of papers in psychiatry. For ten years, Dr. Garcia has worked with juveniles as a Psychiatric Consultant to the Third Judicial District Court. He acknowledged that he failed the foreign graduates medical test, which Montana has since required for licensing.

Dr. Garcia spent about one hour formally interviewing McKenzie. In addition, he observed McKenzie about once a week for five weeks, and received 24-hour reports from attendants and nurses while McKenzie was at Warm Springs. He testified that because McKenzie would not talk about the incident, he could not complete his evaluation. He also acknowledged that he could have made a better evaluation if he had pursued questions about McKenzie's sexuality, but that McKenzie had not wanted to discuss it. Dr. Garcia looked to McKenzie's background, family, verbal communication, thinking processes, ideas, and feelings in drawing his conclusion.

Dr. Garcia found that McKenzie had a passive-aggressive personality, was socially maladjusted, drank excessively and had been dependent on drugs. Like Dr. Wetzler, he found that McKenzie lacked a father figure and felt extreme hostility toward his sister.

According to Dr. Garcia, McKenzie's insight was mildly to moderately impaired, his judgment moderately impaired, and his grasp of his own life and life plan was impaired. At one point, Dr. Garcia testified that McKenzie had poor control over his energy level, particularly his aggressive drive, which would suddenly come out in a "very unacceptable manner," but later testified that he did not have an inability to repress hostile feelings. He found only minimal daydreaming, and only some oversensitivity and difficulty making friends.

Dr. Garcia disagreed that McKenzie had a schizoid personality. Rather, he found some element of antisocial behavior, which he characterized as a personality disorder rather than a mental disorder. He also disagreed with Dr. Wetzler's conclusion that McKenzie could not establish the requisite states of mind, but he acknowledged that whether McKenzie "had the ability to commit a crime" was a "matter of opinion."

9. The State asserts that Dr. Wetzler's testimony is wholly incredible because Dr. Wetzler did not consider the acts McKenzie allegedly committed during the incident with Lana Harding. We disagree. Dr. Wetzler asserted that such acts were irrelevant to his diagnosis. We find it plausible that Dr. Wetzler would have identified a mental disease or defect that simply would not vary with time and that knowledge of the predicate acts was not necessary to his diagnosis. Further, these acts are consistent with Dr. Wetzler's description of a schizoid personality. Finally, we believe that it is within the realm of the expert to determine what facts are relevant to a psychiatric diagnosis.

The State's second witness, Dr. Edward Shubat, is a clinical psychologist with the Great Falls Clinic Department of Psychology. He received his Ph.D. in 1969, having interned in 1968 and 1969 at the Palo Alto Veterans Hospital. He is a member of various psychological associations and is an accepted candidate for a diploma by the American Board of Professional Psychologists.

He interviewed McKenzie the Saturday before trial. During the interview he administered four psychological tests and took McKenzie's background. He acknowledged that psychological tests are designed to confirm or augment other diagnostic methods. He claimed that severe mental disease would show up on the tests, but Dr. Wetzler disagreed that they could necessarily reflect a schizoid type disturbance.

Dr. Shubat was able to give only a "diagnostic impression" because McKenzie did not provide him with all of the facts. Dr. Shubat found an antisocial personality. McKenzie had difficulty relating to other people, had little or no regard for them, and exhibited compulsive and self-defeating behavior. He had difficulty with anger and aggression. His "diagnostic impression" was that McKenzie could have established the requisite states of mind.

The evidence seems quite balanced—certainly not conclusive for either side. Yet the majority concludes that the jury, on the instructions given, in fact, beyond a reasonable doubt, could and did reach a guilty verdict without relying on the impermissible presumptions. It reasoned that the fact that the jury was instructed not to use

a presumption in making its determination that McKenzie acted with a particular purpose indicates that the jury properly found the particular purpose element.[10] Having found that McKenzie did act with a particular purpose, the jury necessarily rejected the defense psychiatrist's, Dr. Wetzler's, testimony that McKenzie was incapable of acting knowingly or purposefully. The jury therefore, if properly instructed, would have found that McKenzie acted knowingly or purposefully.[11] This argument is seriously flawed.

To support this argument, the majority adopts the state's view that the jury must have considered the "particular purpose" element before the "knowingly and purposely" element. This, the majority and the State reason, is the only way a rational juror could have reconciled the two conflicting applicable instructions: (1) that the jury could use a presumption in determining the knowingly or purposefully element, with (2) the instruction that it could use only an inference in determining the particular purpose. However, we find no basis to assume that no rational juror could have considered the knowingly or purposefully element first. The instructions required each juror to parse and recombine numerous directives, a task, if undertaken at all, that could lead to two paths of analysis—to determine the knowingly or purposefully element first and then the particular purpose, or to reverse the order. Further, the State's argument ignores the instructions that strongly suggest that the jury consider the knowingly or purposefully element first. *See, e.g.,* Instr. 36;[12] *see generally*

10. Even this direction to the jury was flawed. Instruction 36 does instruct that proof of particular purpose is necessary in order to find aggravated kidnapping, and cautions jurors that such a purpose can never be presumed. But one "particular purpose" the jury was told it could find was facilitating the commission of sexual intercourse without consent. Aggravated assault was another such purpose. In other instructions, the trial judge directed the jury to rely on the unconstitutional presumptions in finding these underlying felonies. Instr. 37 (sexual intercourse with consent); Instr. 38 (aggravated assault).

11. The State also relied on the fact that the physical acts committed by McKenzie tended to

show McKenzie's mental capacity. But these acts are equally, or, in fact, more consistent with those of a madman than with those of a sane one. The State and the majority also argued that the jury's rejection of McKenzie's insanity defense indicates that it rejected Dr. Wetzler's testimony. This argument, however, ignores the critical difference of the allocation of burden of proof in those two defenses.

12. Instruction 36 states: "The offense of Aggravated Kidnapping *in addition to* the proof required to prove the offense of kidnapping, requires that the kidnapping was committed for a particular purpose.... Therefore, *if you find beyond a reasonable doubt that the defendant*

*McKenzie*, 608 P.2d at 484–86 (Shea, J., dissenting). When jury instructions are inconsistent, we cannot assume that the jury chose the constitutional path. *Francis*, 105 S.Ct. at 1975–76. Because a rational juror could have considered first the knowingly and purposefully element, the unconstitutional presumption could well have tainted a juror's consideration of the particular purpose element, thereby impermissibly providing a building block from which to use the inference. Having found—although improperly—that McKenzie acted knowingly or purposefully, it is but a small step to choose among possible objectives McKenzie's alleged particular purpose.

Even if we were to agree that the jury, through an uncanny ability to make sense of these instructions, determined first McKenzie's particular purpose, it cannot be determined beyond a reasonable doubt that the jury rejected Dr. Wetzler's testimony concerning diminished capacity even though finding a particular purpose. Although twice referring to the particular purpose element as a mental state, *see* Instrs. 34, 36, the trial judge nowhere defined the element as an intent requirement nor explained what is necessary to reach a finding that the element was present.[13] Further, one of the particular purposes, "to satisfy some [ ] untoward propensity of the assailant" does not invite consideration of Dr. Wetzler's testimony at all.

Some of the particular purposes arguably could have been viewed by the jury as involving an intent requirement. Nonetheless, these instructions are also tainted by the unconstitutional presumption. Instruction 30 directs the jury to presume that McKenzie is of sound mind. The trial court directed the jury to read all of the instructions together with all of the other instructions. Implicitly, then, instruction 30 must have had an impact on the particular purpose instructions or, at least, there is a high likelihood that it did. *See Francis*, 105 S.Ct. at 1972–77 (involving a similar "sound mind" instruction). In addition, several of the particular purposes permit consideration of the underlying felonies. Elsewhere, the trial judge directed the jury to use the unconstitutional presumptions in finding these underlying felonies. *See* Instr. 37 (sexual intercourse without consent); Instr. 38 (assault). The majority's answer is that the trial judge directed the jury "never" to use a presumption in determining a particular purpose. In actuality, that instruction is inconsistent with the other instructions and only adds to the confusion. It is not clear beyond a reasonable doubt that it was the only instruction a rational juror would follow. *Francis*, 105 S.Ct. at 1975–76. We simply cannot agree with the majority that the jury, in fact, beyond a reasonable doubt, did not rely on the unconstitutional presumptions.

Nor are we persuaded by applying the *Rose–Pope* analysis that "the facts found by the jury were such that it is clear beyond a reasonable doubt that if the jury had never heard the impermissible instruction its verdict would have been the same." *Pope*, 107 S.Ct. at 1922 n. 6. Looking at the record as a whole, we must determine whether " 'the evidence was so dispositive on intent that ... beyond a reasonable doubt ... the jury would have found it unnecessary to rely on the presumption.' " *Rose*, 106 S.Ct. at 3109 (quoting *Connecticut v. Johnson*, 460 U.S. 73, 97 & n. 5, 103 S.Ct. 969, 983 & n. 5, 74 L.Ed.2d 823 (1983) (Powell, J., dissenting)).

We are confronted essentially with the conflicting evidence of the State's and the defendant's expert psychiatrists as to the capacity of the defendant to form criminal intent. It appears fairly evenly balanced. Our role is not to judge the credibility of the witnesses, but rather to determine

---

... *did kidnap* Lana Harding, before he can be found guilty of the offense of aggravated kidnapping ..., *you must further find* beyond a reasonable doubt that he acted while having at least one of the particular purposes charged." (Emphasis added.) *See also* Instr. 34.

In addition, instructions 29 and 32 require that the particular purpose be proved *"in addi-*

*tion to* proof that he committed said act either knowingly or purposefully." (Emphasis added.)

13. We do not think that Instr. 10 clarified for the jury the meaning of the particular purpose element.

whether any juror could have had a reasonable doubt as to the defendant's capacity to form a criminal intent.

Because of the conflicting testimony of qualified experts, directed to the critical issue of mental capacity, who can say beyond a reasonable doubt how the jury, unburdened from the wrong and confusing instructions, would have decided whether McKenzie had the requisite intents? We simply *can't know* and certainly we cannot know beyond a reasonable doubt. Even if we were to accept that the jury's findings of "particular purposes" were properly made, the "particular purposes" are a strange assortment of goals, not all of which are clearly matters of intent. The finding of "particular purposes" does not make it clear beyond a reasonable doubt that the jury, if properly instructed, would have found an intent to kill or kidnap. The capacity to have a particular purpose does not necessarily encompass the capacity to entertain a rather different kind of intent.

Nor can we assume that the jury, in finding that McKenzie entertained a particular purpose, necessarily rejected all of Dr. Wetzler's testimony. The jury was not required to accept or reject that testimony in its entirety; it could have accepted portions of it and drawn its own conclusions regarding McKenzie's ability to entertain particular kinds of intent.

When intent is at issue, a *Sandstrom* error ordinarily cannot be harmless. *See Bowen v. Kemp*, 832 F.2d 546 (11th Cir. 1987) (en banc). The evidence of intent must be overwhelming to make the error harmless. *Id.* at 551. The evidence of McKenzie's capacity to form the requisite intents was far from overwhelming.

## CONCLUSION

Duncan McKenzie was accused of heinous and violent crimes. But the nature of the crimes does not excuse the State of Montana from affording him a fair trial. The errors in instructions were many and monstrous, intertwined and confusing. They obscured the only issue: whether McKenzie had the capacity to form the requisite criminal intent. The effect was to deny Duncan McKenzie a fair trial.[14] The district court's decision dismissing the writ of habeas corpus should be reversed.

### APPENDIX TO DISSENT

The State of Montana, Plaintiff,

v.

Duncan Peder McKenzie, Jr., Defendant.

Criminal Case No. 6593A

IN THE DISTRICT COURT OF THE EIGHTH JUDICIAL DISTRICT OF THE STATE OF MONTANA, IN AND FOR THE COUNTY OF CASCADE.

Filed Feb. 1, 1975

### PRELIMINARY INSTRUCTIONS

LADIES AND GENTLEMEN OF THE JURY:

The following are preliminary written instructions of the law in this case, and at the conclusion of the trial additional instructions may be necessary, and, if so, they will be given to you. These instructions are given to you at this time to assist you throughout the trial of the case.

1. It is the duty of the Judge to instruct the jury on the law applicable to this case, and it is your duty as jurors to follow the law as I shall state it to you.

2. The function of the jury is to try the issues of fact that are presented by the allegations in the information filed in this Court and the defendant's pleas of "Not Guilty". This duty you should perform uninfluenced by passion or prejudice. You must not suffer yourselves to be biased against a defendant because of the fact that he has been arrested for these offenses, or because an information has been filed against him, or because he has been brought before the Court to stand trial. None of these facts is evidence of his guilt and you are not permitted to infer or to speculate from any or all of them that he is more likely to be guilty than innocent.

14. We do not reach the other issues addressed by the majority.

3. By no remark made by the Court during the trial nor by these instructions does the Court express any opinion as to the facts in this case or what verdict you should return.

4. You should take the law in this case from the Court's instructions alone. You should not give any weight to statements of counsel or of anyone else as to what the law is, nor should you allow yourselves to decide this case contrary to these instructions, even though you might believe that the law ought to be otherwise. Counsel, however, are privileged to comment and argue to the jury upon the law as given in these instructions. If, in these instructions, any rule, direction or idea be stated in varying ways, no emphasis thereon is intended by me, and none must be inferred by you; neither are you to single out any certain sentence, or any individual point or instruction, and ignore the others, but you are to consider all of the instructions as a whole, and are to regard each in the light of all the others. The order in which the instructions are given has no significance as to their relative importance.

5. You are to be governed solely by the evidence introduced in this trial and the law as stated to you by me. The law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. Both the State and the defendant have a right to demand, and they do demand and expect that you will conscientiously and dispassionately consider and weigh the evidence and apply the law to the case and that you will reach a just verdict.

### 6. STATEMENT OF THE CASE

The defendant, DUNCAN PEDER McKENZIE, JR., is accused in the information filed against him of the following offenses: Deliberate Homicide—two counts; Aggravated Kidnapping—two counts; Sexual Intercourse Without Consent—one count; Aggravated Assault—two counts. The offenses are charged as follows:

"That Duncan Peder McKenzie, Jr., late of the County of Pondera, on or about the 21st day of January, A.D. 1974 at the County of Pondera in the State of Montana, committed the crimes charged in the following counts, all at locations in Pondera County Montana."

COUNT I: That DUNCAN PEDER McKENZIE, JR., committed the crime of DELIBERATE HOMICIDE, a felony, by purposely or knowingly causing the death of LANA HARDING, a human being, in violation of Section 94–5–101 and Section 94–5–102 R.C.M. 1947.

COUNT II: That DUNCAN PEDER McKENZIE, JR., committed the crime of DELIBERATE HOMICIDE, a felony, by purposely or knowingly causing the death of LANA HARDING, a human being, while the said DUNCAN PEDER McKENZIE, JR., was engaged in the commission of, or in an attempt to commit, or flight after committing or attempting to commit:

1. SEXUAL INTERCOURSE WITHOUT CONSENT, a felony, by knowingly having sexual intercourse with the said LANA HARDING, a female not his spouse, without consent, the said DUNCAN PEDER McKENZIE, JR., being a male person; or

2. AGGRAVATED ASSAULT, a felony involving the use or threat of physical force or violence against the said LANA HARDING, by purposely or knowingly causing:

(a) Serious bodily injury to the said LANA HARDING; or

(b) bodily injury to the said LANA HARDING with a weapon, namely:

(1) a rope, by placing said rope around the neck of the said LANA HARDING; or

(2) a heavy object, by striking the said LANA HARDING upon her head with said heavy object; or

that the said DUNCAN PEDER McKENZIE, JR., committed the crime of DELIBERATE HOMICIDE, a felony, as above alleged, by purposely or knowingly causing the death of the said LANA HARDING:

1. by mean of torture; or

2. by lying in wait or ambush;

in violation of Section 94–5–101, 94–5–102, 94–5–503 and 94–5–202, R.C.M. 1947.

COUNT 3: That DUNCAN PEDER McKENZIE, JR., committed the crime of AGGRAVATED KIDNAPPING, a felony, by knowingly or purposely and without lawful authority restraining LANA HARDING by either secreting or holding the said LANA HARDING in a place of isolation, or by using or threatening to use physical force with the purpose of facilitating the commission, or flight thereafter, of the felony:

1. SEXUAL INTERCOURSE WITHOUT CONSENT, by knowingly having sexual intercourse with the said LANA HARDING, a female not his spouse, without consent, the said DUNCAN PEDER McKENZIE, JR., being a male person; or

2. AGGRAVATED ASSAULT, by purposely or knowingly causing:

(a) serious bodily injury to the said LANA HARDING; or

(b) bodily injury to the said LANA HARDING with a weapon namely:

1. a rope, by placing said rope around the neck of the said LANA HARDING; or

2. a heavy object, by striking the said LANA HARDING upon her head with said heavy object;

in violation of Sections 94–5–303, 94–5–503 and 94–5–202, R.C.M.1947, the said LANA HARDING having died as a result of said criminal conduct.

COUNT 4: That DUNCAN PEDER McKENZIE, JR., committed the crime of AGGRAVATED KIDNAPPING, a felony, knowingly or purposely and without lawful authority restraining LANA HARDING by either secreting or holding the said LANA HARDING in a place of isolation, or by using or threatening to use physical force, with the purpose of inflicting bodily injury on the said LANA HARDING or terrorizing the said LANA HARDING, in violation of Section 94–5–303, R.C.M. 1947, the said LANA HARDING hav-

ing died as a result of said criminal conduct.

COUNT 5: That DUNCAN PEDER McKENZIE, JR., a male person, committed the crime of SEXUAL INTERCOURSE WITHOUT CONSENT, a felony, by knowingly having sexual intercourse with LANA HARDING, a female not his spouse, without consent, in violation of Section 94–5–503, R.C.M. 1947.

COUNT 6: That DUNCAN PEDER McKENZIE, JR., committed the crime of AGGRAVATED ASSAULT, a felony, by purposely or knowingly causing serious bodily injury to LANA HARDING, in violation of Section 94–5–202, R.C.M.1947.

COUNT 7: That DUNCAN PEDER McKENZIE, JR., committed the crime of AGGRAVATED ASSAULT, a felony, by purposely or knowingly causing bodily injury to LANA HARDING with a weapon, namely

1. a rope, by placing said rope around the neck of the said LANA HARDING; or

2. a heavy object, by striking the said LANA HARDING upon her head with said heavy object;

in violation of Section 94–5–202, R.C.M.

Although the Defendant is charged with two counts in each of the offenses of Deliberate Homicide, Aggravated Kidnapping and Aggravated Assault, only one offense of Deliberate Homicide and one offense of Aggravated Kidnapping and one offense of Aggravated Assault are involved in this case. Leave was granted the State of Montana to charge in this manner, and to also charge the offense of Sexual Intercourse Without Consent, in order to meet the problems in proof that arise when an offense or offenses can be committed in different ways, or by different means, or for different purposes.

The Defendant can be convicted or acquitted on any or all of said offenses as you may find the allegations in each of said counts proved or not proved, but in no event may be sentenced for more than one offense of Deliberate Homicide and more

than one offense of Aggravated Kidnapping and more than one offense of Aggravated Assault even though you may find both of the counts with which he is charged in each of said offenses to have been proved beyond a reasonable doubt.

Sentencing, if any, will depend upon the verdict or verdicts which you may return, and under Montana law the matter of sentencing is vested solely in the Court so you are not to concern yourselves therewith.

In arriving at your verdict or verdicts in this case, the subject of penalties or possible punishment is not to be discussed or considered by you and must not in any way be allowed to affect your decisions as to the innocence or guilt of the defendant of the offenses charged.

To each of the seven counts contained in the Information the Court, under the law of this State, ordered a plea of "Not Guilty" to be entered on behalf of the defendant, when under his legal right he stood mute and refused to plead to the counts contained in the Information. Under such pleas of "Not Guilty" every material allegation contained in each of said seven counts is denied.

In order to convict the defendant of the offense charged in any of said counts all of the material allegations contained in that particular count must be proved beyond a reasonable doubt. All of the allegations contained in each Count are material to the charge contained in that count.

### 7. PRESUMPTION OF INNOCENCE— DEFINITION OF REASONABLE DOUBT

You are instructed that a defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal. The effect of this presumption places upon the State the burden of proving the defendant guilty beyond a reasonable doubt.

Reasonable doubt is defined as follows:

It is not a mere possible doubt, because everything relating to human affairs and depending upon evidence is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge.

### 8. MAY NOT CONVICT ON CONJECTURE OR SURMISE

A person may not be convicted on possibilities or on mere conjecture or surmises, however shrewd, but only on evidence establishing his guilt beyond a reasonable doubt; that is, on evidence which establishes an abiding conviction to a moral certainty of the truth of the charge.

### 9. EXCLUDING ALL POSSIBILITY OF ERROR AND PROOF TO ABSOLUTE CERTAINTY NOT REQUIRED

You are instructed that the law does not require demonstration or that degree of proof which, excluding all possibility of error, produces absolute certainty, for such degree of proof is rarely possible. That degree of proof is necessary which convinces the mind and directs and satisfies the conscience of those who are bound to act conscientiously upon it; that is, to a moral certainty of the truth of the charge, no more and no less.

### 10. PURPOSELY DEFINED:

A person acts purposely with respect to a result or to conduct described by a statute defining an offense if it is his conscious object to engage in that conduct or cause that result. When a particular purpose is an element of an offense, the element is established although such purpose is conditional, unless the condition negatives the harm or evil sought to be prevented by the law defining the offense. Equivalent terms such as "purpose" and "with the purpose" have the same meaning.

## 11. KNOWINGLY DEFINED:

A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware of his conduct or that the circumstance exists. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence. Equivalent terms such as "knowing" or "with knowledge" have the same meaning.

## 12. INTENT DEFINED:

Intent is a state of the mind importing conscious purpose, aim or decision.

## 13. FELONY DEFINED:

"Felony" means an offense in which the sentence imposed upon conviction is death or imprisonment in the state prison for any term exceeding one (1) year.

## 14. FORCIBLE FELONY DEFINED:

"Forcible felony" means any felony which involves the use or threat of physical force or violence against any individual.

## 15. THREAT DEFINED:

"Threat means a menace, however communicated to

(a) inflict physical harm on the person threatened or any other person or on property; or

(b) subject any person to physical confinement or restraint; or

(c) commit any criminal offense.

## 16. ACTS DEFINED:

"Acts" has its usual and ordinary grammatical meaning and includes any bodily movement, any form of communication, and where relevant, includes a failure or omission to take action.

## 17. VOLUNTARY ACT DEFINED:

A "voluntary act" is any act that is the product of the effort or determination of the actor, either conscious or habitual.

## 18. BODILY INJURY DEFINED:

"Bodily injury" means physical pain, illness or any impairment of physical condition and includes mental illness or impairment.

## 19. SERIOUS BODILY INJURY DEFINED:

"Serious bodily injury" means bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement, or protracted loss or impairment of the function or process of any bodily member or organ and includes serious mental illness or impairment.

## 20. SEXUAL INTERCOURSE DEFINED:

"Sexual intercourse" means penetration of the vulva, anus or mouth of one person by the penis of another person, or penetration of the vulva or anus of one person by any body member of another person or penetration of the vulva, or anus of one person by any foreign instrument or object manipulated by another person for the purpose of arousing or gratifying the sexual desire of either party. Any penetration, however slight, is sufficient.

## 21. HUMAN BEING DEFINED:

"Human being" means a person who has been born and is alive.

## 22. DELIBERATE HOMICIDE DEFINED:

In this case, insofar as we are concerned with the offense of deliberate homicide, you are instructed:

Deliberate homicide is one kind of criminal homicide. Homicide is deliberate homicide if:

(a) it is committed either purposely or knowingly,

(b) it is committed while the offender is engaged in or is an accomplice in the commission of, or an attempt to commit kidnapping, or any other felony which involves

the use or threat of physical force or violence against the individual.

Proof that the defendant acted both purposely and knowingly is not required. Proof of either of said mental states is sufficient.

## 23. DELIBERATE HOMICIDE BY MEANS OF TORTURE DEFINED:

Deliberate Homicide by Means of Torture insofar as we are concerned with the definition thereof in this case is:

Whoever purposely assaults another physically for the purpose of inflicting cruel suffering upon the person so assaulted for the particular purpose of enabling the assailant to either:

(a) extort anything from such person;

(b) or to persuade such person against his or her will, or

(c) to satisfy some other untoward propensity of the assailant,

and in so doing the assailant causes the death of the person he assails, in the law is guilty of the offense of Deliberate Homicide by Means of Torture, whether or not it was the purpose or intention of the assailant to cause such death.

"Untoward Propensity" means any perverse, wrong, bad or corrupt inclination or tendency.

## 24. DELIBERATE HOMICIDE BY MEANS OF LYING IN WAIT OR AMBUSH DEFINED:

Deliberate Homicide by means of lying in Wait or Ambush, insofar as we are concerned with the definition thereof in this case is:

Whoever conceals himself, and watches and waits for another with the particular purpose of taking such person unawares, and killing him, and he does kill him is Guilty of Deliberate Homicide by means of lying in wait or ambush.

## 25. KIDNAPPING AND AGGRAVATED KIDNAPPING DEFINED:

Insofar as we are concerned with the offense of Kidnapping in this case you are instructed:

*Kidnapping:*

A person commits the offense of kidnapping if he either knowingly or purposely and without lawful authority restrains another person by either secreting or holding him in a place of isolation, or by either using or threatening to use physical force to hold said person.

*Aggravated Kidnapping:*

A person commits the offense of aggravated kidnapping if he either knowingly or purposely restrains another person by either secreting or holding him in a place of isolation or by using or threatening to use physical force to hold said person for any of the following particular purposes:

(a) to facilitate the commission of any felony,

(b) to inflict bodily injury on the victim, or

(c) to terrorize the victim.

## 26. SEXUAL INTERCOURSE WITHOUT CONSENT DEFINED:

A male person who knowingly has sexual intercourse without consent, with a female, not his spouse, commits the offense of sexual intercourse without consent.

"Without Consent" means the victim is compelled to submit by force, or by threat of imminent death, bodily injury or kidnapping, or that the victim is incapable of consent because she is physically helpless.

"Physically helpless" means that a person is unconscious or otherwise physically unable to communicate an unwillingness to act.

## 27. AGGRAVATED ASSAULT DEFINED:

A person commits the offense of Aggravated Assault if he either purposely or knowingly causes either:

(a) Serious bodily injury to another, or

(b) Bodily injury to another with a weapon.

"Weapon" means any instrument or article, or substance which, regardless of its primary function, is really capable of being used to produce death or serious bodily injury.

## 28. COURT ADMONITION TO JURY:

It is your duty not to converse among yourselves or with anyone else, or to suffer yourselves to be addressed by any person on any subject connected with this trial, or to form or express any opinion thereon until the case is finally submitted to you. If anyone should attempt to talk to you about the case, you will advise them that you have been selected as a juror in the case and that you are not permitted to talk about it. If they continue to talk to you, it will be your duty to immediately report the same to the Court.

The State of Montana, Plaintiff,

vs.

Duncan Peder McKenzie, Jr., Defendant.

Criminal Case No. 6593–A

IN THE DISTRICT COURT OF THE EIGHTH JUDICIAL DISTRICT OF THE STATE OF MONTANA, IN AND FOR THE COUNTY OF CASCADE

Filed Feb. 1, 1975

ADDITIONAL INSTRUCTIONS

LADIES AND GENTLEMEN OF THE JURY:

## 29. REQUIREMENT OF VOLUNTARY ACT WITH A MENTAL STATE.

A person to be guilty of any of the offenses charged in any of the seven counts charged in the Information must have committed the act or acts charged voluntarily, while having with regard to each element contained in the law defining the offense one of the mental states contained in the said definition.

### I.

The offense of Deliberate Homicide requires that the voluntary act (the Killing) have been committed by the defendant either knowingly or purposely or that it was committed in the commission of a forcible felony.

### II.

The offense of Deliberate Homicide by Means of Torture requires that the voluntary act (the physical infliction of cruel suffering) be done purposely and in addition thereto that it was done for the particular purpose of enabling the assailant either:

(a) to extort something from the person assailed; or,

(b) to persuade the assailed against his or her will; or

(c) to satisfy some other untoward propensity of the assailant.

### III. [Omitted by Court]

### IV.

The Offense of Kidnapping requires that the voluntary act (the secreting or holding of a victim in a place of isolation without lawful authority, or the holding of said person by physical force or threats thereof) be done either knowingly or purposely.

### V.

The Offense of Aggravated Kidnapping requires that the voluntary act (the secreting or holding the victim without lawful authority in a place of isolation, or the holding of said person by physical force or threats thereof), be done either knowingly or purposely, and in addition thereto that it be done for one of the following particular purposes: either

(a) to facilitate the commission of any felony (in this case sexual intercourse without consent of the victim, or an aggravated assault upon the victim), or

(b) to inflict bodily injury on the victim, or

(c) to terrorize the victim.

## VI.

The Offense of Sexual Intercourse Without Consent requires that the voluntary act (sexual intercourse without consent) be done knowingly.

## VII.

The Offense of Aggravated Assault requires that the voluntary act (the infliction of serious bodily injury either with or without a weapon, or the infliction of bodily injury with a weapon) be done either knowingly or purposely.

### 30. MENTAL STATE—KNOWLEDGE OR PURPOSE—HOW MANIFESTED

The knowledge or purpose with which an act is done is manifested by the circumstance connected with the offense and the sound mind of the accused. All persons are of sound mind who are not afflicted with a disease or defect of the mind which excludes responsibility for their conduct.

Upon the trial of the issues raised by the pleas of "Not Guilty" to the charges made in the Information, the defendant is presumed to have been free from any disease or defect of the mind which excludes responsibility for his conduct at the time the offenses are alleged to have been committed and to be sane now.

### 31. MENTAL STATE—METHODS OF PROOF

The knowledge or purpose with which an act is committed being a mental state, is incapable of being proved by direct evidence, and proof thereof is permitted by indirect or circumstantial evidence, which means proof by rules of law, denominated inferences and presumptions.

In considering the question of mental state (either knowledge or purpose) it is necessary that you understand the difference between direct and indirect or circumstantial evidence and the legal distinction between inferences and presumptions, so that you use and apply the correct rule in evaluating the evidence, and in your determination of the questions of knowledge or purpose.

Direct evidence is evidence obtained through the use of any of the five senses, and which proves the fact in question without the use of either inferences or presumptions.

Direct evidence, if found to be true, is conclusive proof of the facts testified to.

Indirect evidence, also known as circumstantial evidence, does not prove the fact in question directly. Rather the fact in question is deduced, that is reasoned, from a proved fact, or facts. Indirect evidence is of two kinds; namely presumptions and inferences.

A presumption is a deduction or reasoning which the law expressly directs a jury make from proved fact or facts; while an inference is a deduction or reasoning which the law permits or allows the jury to draw from the fact or facts proved.

Presumptions expressly direct you to reason from proved facts.

Inferences permit you to reason from proved facts.

It is not necessary that facts be proved by direct evidence. They may be proved also by indirect evidence or by a combination of both direct and indirect evidence. Both direct evidence and indirect evidence are acceptable as a means of proof. Neither is entitled to any greater weight than the other.

*By way of example only, and to illustrate the difference between direct and indirect evidence and the difference between inferences and presumptions of law, you are instructed:*

### I.

*Proof by Direct Evidence* (Testimony obtained through the use of any of the five senses, and which prove the fact in question without the use of either inferences or presumptions and which, if found true, conclusively prove such fact):

The witness actually saw "A" pick up a board and hit "B" over the head with it knocking "B" to the ground with a bleeding head. He testified only as to what he

saw: "A" picking up the board, hitting "B" over the head with it and "B" being knocked to the ground with a bleeding head. If the jury believes the witness it conclusively proves without the use of inference or presumption only that "A" picked up a board and struck "B" over the head with it and "B" was injured thereby. "A's" mental state—did he hit "B" over the head knowingly and purposely to injure "B"—has to be reasoned from the fact "A" picked up the board and from the manner and way he used it in striking "B", and from any other facts and circumstances proved in connection with the matter, that is proved by indirect or circumstantial evidence (inference or presumption).

## II.

### *Proof by Indirect or Circumstantial Evidence.*

(Deduction or reasoning which the jury makes from facts proved):

1. *Proof by Inference* (Deduction which the reason of the jury makes from facts proved without an express direction of the law to that effect).

The witness heard a cry for help, he immediately looked out of the window and saw only two men: "A" holding a board, was standing over the body of "B" who was unconscious on the ground bleeding from a wound in his head. He did not see "A" strike "B" and testified only as to what he saw and heard. Other evidence was introduced to show that the board then held by "A" had blood on it which was the same type as "B's" blood, and that "A" had a motive for striking "B" and had made threats against "B".

If the jury believes the witness and the other evidence which was introduced they are permitted to deduce; that is, reason therefrom that "A" struck "B" with the board and that he did so intentionally; that is knowingly or purposely.

2. *Proof by Presumption of Law* (Deductions which the law expressly directs to be made from particular facts):

The witness heard a cry for help. He immediately looked out of a window and saw only two men; "A" holding a board and standing over the body of "B" who was unconscious on the ground and with his head bleeding. Other evidence was introduced to show that the board then held by "A" had blood on it which was the same type as "B's" blood and evidence was introduced that "B" had been struck on the head three times by the board to show that the striking was not accidental. No evidence was introduced as to a motive for "A's" striking "B" and no evidence of threats by "A" against "B" was introduced.

If the jury believes the witness and the other evidence introduced they are permitted to deduce or reason that "A" struck "B" over the head with the board intentionally and for the purpose of injuring him but in addition thereto the law presumes, that is, the law expressly directs the jury to reason: That an unlawful act was done with an unlawful intent and also that a person is presumed to intend the ordinary consequences of his voluntary act.

Having found that "A" struck "B" over the head with a board three times, intentionally (absent any evidence that the act was in self defense by "A"), "A's" act was unlawful and the jury is expressly directed to reason that "A" struck "B" with an unlawful intent; that is, knowingly or purposely and is further expressly directed to reason that he intended to inflict the injuries that ordinarily result from such an act.

There are other legal presumptions besides those referred to in the foregoing illustration and you will be instructed with particularity as to the use of inferences and presumptions as they may have application to each Count with which the defendant is charged.

Further, unless you are otherwise instructed with regard to a particular presumption, all presumptions are rebuttable; that is, they may be controverted and overcome by other evidence.

## 32. PARTICULAR PURPOSE NEVER TO BE PRESUMED

In offenses which require proof of a particular purpose the particular purpose re-

quired may never be proved by means of legal presumptions, but must be proved by means of inferences only. In this case the offenses of: Deliberate Homicide by Means of Torture and Aggravated Kidnapping all require proof that the defendant committed the particular act charged for a particular purpose, in addition to proof that he committed said act either knowingly or purposely.

### 33. METHOD OF PROOF APPLICABLE TO THE OFFENSE OF DELIBERATE HOMICIDE

The mental state accompanying the voluntary act required for the offense of deliberate homicide being either knowingly or purposely and not requiring in addition thereto that the act be committed for a particular purpose, proof of the mental state may be made by the use of either inferences or presumptions, or by the use of both inferences and presumptions.

#### I. *Proof of Mental State by Inference*

If you find from the evidence beyond a reasonable doubt that the defendant, on or about January 21, 1974, in Pondera County, Montana, in the commission of a voluntary act, caused the death of Lana Harding, you are permitted from that fact alone to deduce or reason that he did so either knowingly or purposely, if no circumstances of mitigation, excuse or justification appear in the evidence.

You will be instructed on mitigation, excuse and justification if such instructions are needed.

In addition to the fact of death being voluntarily caused by the accused, you may, and are instructed to also consider all of the facts and circumstances connected with said death, that have been proved in the evidence in determining whether or not the defendant acted either knowingly or purposely.

#### II. *Proof of Mental State by Presumptions.*

(1) If you find beyond a reasonable doubt that the defendant, on or about January 21, 1974, in Pondera County, Montana, voluntarily committed an illegal act on Lana Harding, such as assaulting or injuring her, the law presumes that an unlawful act was done with an unlawful intent; that is, the law expressly directs you to reason from such unlawful act that the defendant acted with an unlawful intent, or purpose.

This is a rebuttable presumption, which means it may be controverted and overcome by other evidence, but whether or not a presumption, once it has come into effect is overcome, is for the jury to determine.

(2) The law also presumes that a person intends the ordinary consequence of his voluntary act.

Therefore, if you find beyond a reasonable doubt that the defendant, on or about January 21, 1974, in Pondera County, Montana, voluntarily and unlawfully assaulted or injured Lana Harding, and if you further find beyond a reasonable doubt that the death would result as the ordinary consequence of such an assault or injury, the law presumes that, and expressly directs you to reason therefrom that the defendant intended to cause said death regardless of whether or not he actually had such an intent or purpose.

This also is a rebuttable presumption capable of being controverted and overcome, but once it has come into effect it is for the jury to determine whether or not it has been rebutted.

#### III. *Proof of Deliberate Homicide by Commission of a Forcible Felony*

Under subdivision (b) in the definition of deliberate homicide you have been instructed a homicide is deliberate homicide if it is committed while the offender is engaged in the commission of, or an attempt to commit sexual intercourse without consent, kidnapping or any other felony which involves the threat of any physical force or violence against any individual.

Sexual Intercourse without consent, Kidnapping and Aggravated Kidnapping and Aggravated Assault have been defined for you. All of these offenses are felonies which involve the threat of physical force or violence against an individual.

Therefore, if you find from the evidence beyond a reasonable doubt that the defendant, on or about January 21, 1974, in Pondera County, Montana, while engaged in: —the offense of Sexual intercourse without consent, or in the offense of kidnapping, or in the offense of aggravated kidnapping, or in the offense of aggravated assault,— caused the death of Lana Harding, the law has declared that he has committed the offense of deliberate homicide, regardless of whether or not it was his purpose or intent to cause such death.

## 34. METHODS OF PROOF APPLICABLE TO DELIBERATE HOMICIDE BY MEANS OF TORTURE

The mental state of purposely assaulting another physically to inflict cruel suffering upon that person for a particular purpose cannot be proved by using the legal presumptions you have been directed to use in the proof of deliberate homicide, and must be proved by the use of inferences alone.

Therefore, if you find from the evidence beyond a reasonable doubt that the defendant, on or about January 21, 1974, in Pondera County, Montana, purposely assaulted Lana Harding physically and inflicted cruel suffering upon her and in so doing caused her death, you are permitted to infer, that is, deduce or reason from the facts and circumstances which are proved in connection therewith, that he did so for one or more of the particular purposes charged; either,

(a) to extort something from her, or

(b) to persuade her to do something against her will, or

(c) to satisfy some other untoward propensity of the defendant.

And if you find one or more of said particular purposes to have been proved beyond a reasonable doubt and that the defendant killed her while purposely so inflicting cruel suffering upon her, he has committed the offense of Deliberate Homicide by means of Torture, whether it was or was not his purpose or intention to kill her.

## 35. METHOD OF PROOF APPLICABLE—KIDNAPPING

The offense of kidnapping is a lesser offense included in the charges of Aggravated Kidnapping made in Counts 3 and 4 of the Information.

The charge of kidnapping requires that the defendant need only to have either knowingly or purposely, without unlawful authority, restrained Lana Harding by secreting or holding her in a place of isolation, or by using or threatening to use physical force to hold her.

It does not require, as does the offense of Aggravated Kidnapping, that the defendant have had in addition to such unlawful restraining a particular purpose in mind, such as the purpose to commit sexual intercourse without her consent, or to inflict bodily injury on her, or to terrorize her.

Therefore, the mental state of either knowingly or purposely restraining Lana Harding may be proved by way of inferences or presumptions of law or by the use of both inferences and presumptions of law.

### I. *Proof by Inference*

If you find beyond a reasonable doubt that the defendant, on or about January 21, 1974, in Pondera County, Montana, without lawful authority, voluntarily restrained Lana Harding, either by secreting her in a place of isolation, or by using physical force, or by threatening to use physical force to hold her, you are permitted to reason therefrom and from all other facts and circumstances connected therewith that he did so either knowingly or purposely.

### II. *Proof by Presumption*

If you find beyond a reasonable doubt that the defendant, on or about January 21, 1974, in Pondera County, Montana, without lawful authority, restrained Lana Harding, either by secreting her in a place of isolation, or by using physical force, or by threatening to use physical force to hold her, the law presumes that he acted therein with an unlawful intent, purpose or knowl-

edge, and expressly directs you to so reason.

This presumption in law that an unlawful act was done with an unlawful intent is as you have heretofore been instructed, a rebuttable presumption subject to being controverted and overcome by other evidence as you may find the evidence to be.

## 36. METHOD OF PROOF—AGGRAVATED KIDNAPPING

The offense of Aggravated Kidnapping, in addition to the proof required to prove the offense of kidnapping, requires proof that the kidnapping was committed for a particular purpose.

In this case Count 4 requires proof that the Kidnapping was for a particular purpose either to inflict bodily injury on Lana Harding, or to terrorize her and Count 3 requires that the kidnapping have been for the particular purpose of facilitating the commission of a felony: either sexual intercourse with Lana Harding without her consent, or to commit an Aggravated Assault on her.

Therefore, if you find beyond a reasonable doubt that the defendant, on or about January 21, 1974, in Pondera County, Montana, did kidnap Lana Harding, before he can be found guilty of the offense of aggravated kidnapping as charged in the Information, you must further find beyond a reasonable doubt that he acted while having at least one of the particular purposes charged.

Since a particular purpose may never be presumed in law, the mental state of either knowingly or purposely secreting or holding for a particular purpose must be proved by inference only without the use of any presumptions of law.

This means if you find beyond a reasonable doubt that the defendant did kidnap Lana Harding, you are permitted to deduce or reason from any and all facts and circumstances proved in connection therewith that he did so with one or more of the particular purposes charged in Counts 3 and 4, and to find beyond a reasonable

doubt that he committed the offense as charged.

## 37. METHODS OF PROOF APPLICABLE TO SEXUAL INTERCOURSE WITHOUT CONSENT

### I. *Proof by Inference*

You are permitted to deduce, that is reason, from facts proved beyond a reasonable doubt: That the defendant on or about the 21st day of January, 1974, in Pondera County, Montana, without the consent of Lana Harding, who was not his wife, knowingly had sexual intercourse with her, and to find beyond a reasonable doubt, that he committed the offense of sexual intercourse without consent as charged.

### II. *Proof by Presumption*

Since the offense of sexual intercourse without consent does not require that the act be done purposely or for a particular purpose and may be proved by showing the act was knowingly done, proof of such mental state can be made by presumption.

Therefore, since the law presumes that an unlawful act was done with an unlawful intent if you reason from facts proved be-yond a reasonable doubt that the defendant on or about January 21st, 1974, in Pondera County, Montana, had sexual intercourse with Lana Harding who was not his wife, and without her consent, you are expressly directed to reason therefrom, that he did so knowingly, and you may find therefrom beyond a reasonable doubt that he committed said offense as charged.

This presumption that an unlawful act was done with an unlawful intent is a rebuttable presumption subject to being controverted and overcome as you may find the evidence to be.

## 38. METHODS OF PROOF APPLICABLE TO THE OFFENSE OF AGGRAVATED ASSAULT

### I. *Proof by Inference*

You are permitted to reason from facts proved beyond a reasonable doubt:

(a) That the defendant on or about the 21st day of January, 1974, in Pondera County, Montana, either knowingly or purposely caused Lana Harding serious bodily harm (as distinguished from just bodily harm) without the use of a weapon, and/or

(b) That on or about the 21st day of January, 1974, in Pondera County, Montana, the defendant either knowingly or purposely with a weapon, inflicted bodily harm (as distinguished from serious bodily harm) on Lana Harding, and to find beyond a reasonable doubt that the defendant committed the offense as charged.

## II. *Proof by Presumptions*

Since the offense of aggravated assault may be committed either knowingly or purposely, the offense may be proved by showing the act was knowingly done, and the legal presumptions that: "An unlawful act was done with an unlawful intent, and the legal presumption that a person is presumed to intend the ordinary consequences of his voluntary act," can be used to prove the mental state of knowingly.

Therefore, if you reason from facts proved in the evidence beyond a reasonable doubt that the defendant on or about the 21st day of January, 1974, in Pondera County, Montana, unlawfully caused Lana Harding bodily injury either with or without a weapon, the law expressly directs you to reason therefrom that he acted with unlawful intent that is purposely; and if you further reason from facts proved beyond a reasonable doubt that the harm inflicted by him was such as ordinarily results from an act such as defendant's, the law expressly directs you to reason that he intended the consequences of his act.

These presumptions "that an unlawful act was done with an unlawful intent", and "A person is presumed to intend the ordinary consequences of his voluntary act", are both rebuttable presumptions, each being subject to being controverted and overcome by other evidence as you may find the evidence to be.

## 39. CIRCUMSTANTIAL EVIDENCE—TEST OF SUFFICIENCY

You are instructed when the proof of any allegation required to prove a criminal offense against a defendant rests entirely on indirect or circumstantial evidence, the defendant may not be found guilty of the offense unless:

1. Each fact or circumstance which is presented to complete a chain of circumstances that will establish guilt must be proved beyond a reasonable doubt, and

2. Such proved facts and circumstances must be consistent only with a hypothesis of guilt and inconsistent with any other rational conclusion.

This does not mean that each proved fact or circumstance considered alone must be consistent only with a hypothesis of guilt, but that each fact or circumstance from which guilt may be deduced or reasoned must be proved beyond a reasonable doubt and that all of the proved facts and circumstances when considered together and as a whole give rise to the deduction or reasoning that the defendant is guilty. The doctrine of reasonable doubt applies only to the proof of guilt and not to proving that each link in a chain of evidence used to show guilt is consistent only with guilt. Any proved fact or circumstance when considered by itself may give rise to an inference which is as equally consistent with innocence as it is with guilt, but all of the proved facts and circumstances when considered together must be consistent only with a hypothesis or inference of guilt and inconsistent with any other rational inference or deduction.

## 40.

If the evidence in this case as to any particular charge is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant's

innocence, and reject that which points to his guilt.

You will notice that this rule applies only when both of the two possible opposing conclusions appear to you to be reasonable. If, on the other hand, one of the possible conclusions should appear to you to be reasonable and the other to be unreasonable, it would be your duty to adhere to the reasonable deduction and to reject the unreasonable, bearing in mind, however, that even if the reasonable deduction points to defendant's guilt, the entire proof must carry the convincing force required by law to support a verdict of guilt.

### 41. PRODUCTION OF ALL EVIDENCE NOT REQUIRED

Neither the prosecution nor the defense is required to call as witnesses all persons who are shown to have been present at any of the events involved in the evidence or who may appear to have some knowledge of the matters in question in this trial; nor is the prosecution or defense required to produce as exhibits all objects or documents that have been referred to in the testimony, or the existence of which may have been suggested by the evidence.

### 42. DIRECT AND CIRCUMSTANTIAL EVIDENCE EQUALLY ENTITLED TO CONSIDERATION

Two classes of evidence are recognized and admitted in courts of justice, upon either or both of which, juries lawfully may base their findings, whether favorable to the State of Montana or to the defendant, provided, however, that to support a verdict of guilt the evidence, whether of one kind or the other or a combination of both, must carry the convincing quality required by law.

One type of evidence is known as direct and the other as circumstantial. The law makes no distinction between the two classes as to the degree of proof required for conviction or as to their effectiveness in defendant's favor, but respects each for such convincing force as it may carry and accepts each as a reasonable method of proof.

### 43. REGARDING FAILURE OF DEFENDANT TO TESTIFY

It is a Constitutional right of a defendant in a criminal trial that a defendant may not be compelled to testify.

In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence, and upon the failure, if any, of the prosecution to prove every essential element of the particular charges against him. No lack of testimony on the defendant's part will supply a failure of proof by the prosecution so as to support by itself a finding against him on any essential element of a particular charge or charges.

If the defendant chooses not to testify you are not to consider his choice in any manner as evidence against him nor to allow it to prejudice your deliberations in any way.

### 44. CREDIBILITY OF WITNESSES AND PRESUMPTION OF TRUTH

The jury are the sole and exclusive judges of the effect and value of evidence addressed to them and of the credibility of the witnesses who have testified in the case. The term "witness" includes every person whose testimony under oath has been received as evidence, whether by examination here in court or through deposition.

The character of the witnesses, as shown by the evidence, should be taken into consideration for the purpose of determining their credibility, that is whether or not they have spoken the truth. The jury may scrutinize the manner of witnesses while on the stand, and may consider their relation to the case, if any, and also their degree of intelligence. A witness is assumed to speak the truth. This assumption, however, may be repelled by the manner in which he testifies; his interest in the case, if any, or his bias or prejudice, if any, for or against one or any of the parties; by the character of his testimony, or by contra-

dictory evidence. A witness may be impeached also by evidence that at other times he has made statements inconsistent with his present testimony as to any matter material to the cause on trial.

A witness wilfully false in one material part of his or her testimony is to be distrusted in others. The jury may reject the whole of the testimony of a witness who has wilfully sworn falsely as to a material point. If you are convinced that a witness has stated what was untrue as to a material point, not as a result of mistake or inadvertence, but wilfully and with the design to deceive, then you may treat all of his or her testimony with distrust and suspicion, and reject all unless you shall be convinced that he or she has in other particulars sworn to the truth.

### 45. IMPEACHMENT BY CONTRADICTORY STATEMENTS

In respect to any attempt to impeach a witness by showing that on some former occasion he made a statement or statements that are contradictory of his testimony here, you are instructed that the evidence of any such contradictory statement is not received for the purpose of proving the truth of what then was said, but only for the purpose of testing the credibility of the witness; you are permitted to consider such evidence only for that purpose, and you are the exclusive judges of the effect of such evidence on the witness's credibility.

### 46. REGARDING EXPERT TESTIMONY

Duly qualified experts may give their opinions on questions in controversy at a trial. To assist you in deciding such questions, you may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. You are not bound to accept the opinion of an expert as conclusive, but you should give to it the weight to which you shall find it to be entitled. You may disregard any such opinion, if you find it to be unreasonable.

### 47. REGARDING EVIDENCE ADMITTED FOR A LIMITED PURPOSE

At times throughout the trial of this case evidence was admitted for a limited purpose or purposes. You are to consider the evidence admitted for a limited purpose or purposes for that purpose or those purposes only.

### 48. DIRECT EVIDENCE OF ONE WITNESS SUFFICIENT

The direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact in this case.

### 49. DISTRUST OF WITNESS FOUND WILFULLY FALSE

A witness wilfully false in one material part of his testimony is to be distrusted in other parts thereof.

### 50. REGARDING COURT RULINGS ON EVIDENCE

At times throughout the trial, the Court will be called upon to pass on the question whether or not certain offered evidence may properly be admitted. You are not to be concerned with the reason for the rulings and are not to draw any inferences from them. Whether offered evidence is admissible is purely a question of law. In admitting evidence to which an objection is made the Court does not determine what weight should be given such evidence; nor does it pass on the credibility of the witness. As to any offer of evidence that has been rejected, or any evidence that has been ordered stricken out by the Court, you, of course, must not consider the same; as to any questions as to which an objection was sustained, you must not conjecture as to what the answer might have been, or as to the reason for the objections, nor may you draw any inferences from the question itself.

### 51. DO NOT SPECULATE OR MAKE UNWARRANTED INFERENCES

Do not speculate, conjecture, or make unwarranted inferences as to what the

facts might be, and do not assume the existence of any facts unless there is evidence to justify the conclusion. Nor can you act upon any information, other than the evidence given to you in court; that is, stipulations of counsel, exhibits admitted into evidence and witnesses whose sworn testimony is given and admitted in court. You should consider all of the evidence bearing either way on the question presented to you, regardless of which side has produced it.

You are not bound to decide in conformity with the testimony of a number of witnesses which does not produce conviction in your mind as against the declarations of a lesser number, or a presumption or other evidence which appeals to your mind with more convincing force.

This rule of law does not mean that you are at liberty to disregard the testimony of the greater number of witnesses merely from caprice or prejudice, or from a desire to favor one side as against the other. It does mean that you are not to decide an issue by the simple process of counting the number of witnesses who have testified on the opposing sides. It means that the final test is not in the relative number of witnesses, but in the relative convincing force of the evidence.

## 52. CHARGE OF DELIBERATE HOMICIDE BY LYING IN WAIT OR AMBUSH DISMISSED

The charge of Deliberate Homicide By Lying in Wait or Ambush has been dismissed by the Court and you are not to concern yourselves with this charge, contained in Count II of the Information filed against the defendant.

## 53. DEFENSE OF MENTAL DISEASE OR DEFECT EXCLUDING RESPONSIBILITY

### I.

The defendant has served notice on the Court that he suffers from a mental disease or defect which excludes his responsibility for the acts charged against him by the State of Montana and that he intended to introduce evidence in support of this defense.

By this notice and defense the defendant does not admit that he committed the acts charged against him, but in effect says if you find beyond a reasonable doubt that I did do said acts or any of them, that because of a disease or defect of the mind from which I suffered I was unable at that time to appreciate that said acts were criminal, or in the alternative, if I did appreciate the criminality of the acts I was unable because of said mental disease or defect to avoid the commission of said acts.

### II.

*Mental Disease or Defect Excluding Responsibility—Definition*

A person is not responsible for criminal conduct, if at the time of such conduct, as a result of a mental disease or defect he is unable either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

The term "mental disease or defect" does not include an abnormality or subnormality of the mind manifested only by repeated criminal or otherwise antisocial conduct, but does include any mental abnormality or subnormality that has reached the degree that a person affected thereby is unable to appreciate that an act is criminal; that is, that the act is wrong and is punishable by the law, and it also includes such persons who may know that acts are wrong and are subject to punishment, but are unable to avoid the commission of the prohibited acts, because of some mental abnormality or subnormality.

In the degree of their individual physical attributes and abilities people differ, and, likewise, they differ individually in their degrees of intellect, their ability to understand and appreciate, their knowledge, their learning, their morality and in the degree that each is able to resist doing that which he or she knows to be wrong and punishable by law.

The law in order to protect the individual person and his or her rights recognizes that

these mental differences exist, but in order to protect society the law does not measure and it does not even attempt to measure mental differences in individuals until and unless the differences in question have reached the point that the differences can be truly termed a mental disease or defect which precludes the power of thought and reason and either renders the afflicted person incapable of appreciating that an act is criminal, or is unable to resist doing the criminal act because of said mental disease or defect if he does appreciate the criminality thereof.

When the defense of mental disease or defect excluding responsibility for criminal conduct has been interposed the jury must determine under the definition thereof given by the Court and from all the evidence in the case whether or not the defendant suffered from such a disease or defect of the mind that it excludes his responsibility for the conduct charged against him.

## III.

*Burden of Proof—Mental Disease or Defect Excluding Responsibility for Conduct*

Mental disease or defect excluding responsibility for criminal conduct is an affirmative defense, which means that the defendant must give advance notice thereof and prove this defense by a preponderance of the evidence.

By a preponderance of the evidence is meant such evidence as when weighed with that opposed to it has the more convincing force and the greater probability of truth.

The law has placed this burden on defendants in criminal cases because in law all persons are presumed to be free from mental diseases and defects which exclude their responsibility for conduct and to be accountable for their conduct (that is the law expressly directs the jury to so reason). This presumption that all persons are free from mental diseases and defects and are accountable for their conduct is a rebuttable presumption which the defendant has the burden of controverting and overcoming.

Therefore, if you find beyond a reasonable doubt that the defendant did do the act or any of the acts charged against him you are expressly directed by the law to deduce or reason that at the time of such conduct he was able to appreciate the criminality of his conduct and to conform his conduct to the requirements of law.

To overcome this express direction of the law the defendant must prove by a preponderance of the evidence, that he suffered from such an abnormality or subnormality of the mind at the time of such conduct that the jury cannot say that it does not have a reasonable doubt as to his responsibility for such conduct.

Since the defendant, by the interposing of the defense of disease or defect of the mind which excludes responsibility for conduct, does not admit any of the acts charged against him, and since the defense goes only to the mental responsibility and control of the defendant, you should first determine from the evidence in the case beyond a reasonable doubt whether the defendant did do the acts charged against him in the Information. If you find beyond a reasonable doubt that the defendant did do said acts or any of them you must then consider whether or not the defendant has overcome the presumption of accountability and whether or not he has created a reasonable doubt in your minds as to his mental accountability and responsibility for any of the acts you may find he committed, and whether or not he could have had the requisite mental state for the act or acts which you have found he committed.

## 54. VERDICT FORMS AND INSTRUCTIONS AS TO THEIR USE

Upon retiring to your jury room you will select one of the jurors to act as foreman, who will preside over your deliberations, and who will date and sign the verdict or verdicts and which you agree.

In order to return a verdict, all twelve jurors must agree to the decision, including the additional findings you are asked to make on the Guilty of Deliberate Homicide

verdict form and on the Guilty of Aggravated Kidnapping verdict form.

## I.

### Verdict Form—Mental Disease or Defect Excluding Responsibility for Conduct

If after considering all of the charges made against the defendant you have found that the defendant committed the acts charged, or did commit any of the acts charged, and have further determined that he suffered from a mental disease or defect which excludes his responsibility for said act or acts, you are furnished with a form upon which to return such a verdict, to wit: Not Guilty of any of the offenses charged against him because of a mental disease or defect which excludes responsibility for his conduct.

If you reach this verdict have your foreman date and sign this verdict form and return with it to the courtroom.

If, of course, you do not find that the defendant committed any of the acts charged, you will not need to use this form, but instead will return a verdict of Not Guilty of any of the offenses charged against him on a verdict form furnished you for such a verdict.

## II.

### Verdict Forms—Deliberate Homicide

You are to consider each and all of the charges remaining against the defendant, and even though you may find more than one or all of said charges to have been proved beyond a reasonable doubt, as only one death is alleged, only one Guilty of Deliberate Homicide verdict form is required.

You are also furnished with a Not Guilty of Deliberate Homicide verdict form to use if such is your verdict.

If you adopt the Guilty of Deliberate Homicide verdict form you are asked to find on that form whether the Deliberate Homicide was or was not By Means of Torture as this is the most serious of the remaining charges of Deliberate Homicide made against the defendant.

After you have reached a verdict on the charges of Deliberate Homicide, whether Guilty or Not Guilty, you are still required to return a verdict on the charges of Aggravated Kidnapping. Have your foreman date and sign the verdict form upon which you agree on the charges of Deliberate Homicide and take up the Charges of Aggravated Kidnapping.

## III.

### Verdict Forms—Aggravated Kidnapping

Since only one Aggravated Kidnapping is alleged, though in different ways and for different purposes, you are to consider all of the charges of Aggravated Kidnapping made against the defendant and even though you may find more than one or all of the charges of Aggravated Kidnapping to have been proved beyond a reasonable doubt you are furnished with only one verdict form upon which to return a verdict of Guilty of Aggravated Kidnapping.

You are also furnished with a Not Guilty of Aggravated Kidnapping verdict form to use if such is your verdict.

If you adopt the Guilty of Aggravated Kidnapping form you will be required to find on that form whether Lana Harding did or did not die as a result of said Aggravated Kidnapping.

After you have reached a verdict on the Charges of Deliberate Homicide and a verdict on the charges of Aggravated Kidnapping, if you have found him Guilty of Deliberate Homicide or Guilty of Aggravated Kidnapping or Guilty of both of said offenses, have your foreman date and sign the verdict forms and return with them to the Court, for if you have found him guilty of either or both Deliberate Homicide and/or Aggravated Kidnapping the remaining charges of Sexual Intercourse without Consent, Aggravated Assault and Kidnapping are all lesser offenses which are included in the charges of Deliberate Homicide, and Aggravated Kidnapping in this case.

If you have found the defendant Not Guilty of Deliberate Homicide and Not Guilty of Aggravated Assault you are re-

quired then to return a verdict on the charge of Sexual Intercourse Without Consent which is the most serious of the remaining charges.

## IV.

*Verdict Forms—Sexual Intercourse Without Consent*

If you have adopted the Not Guilty of Deliberate Homicide verdict form and have adopted the Not Guilty of Aggravated Kidnapping verdict form, you have been furnished with a verdict form for Guilty of Sexual Intercourse Without Consent and a verdict form for Not Guilty of Sexual Intercourse Without Consent. Use the form which you find to be appropriate.

If you adopt the Guilty of Sexual Intercourse Without Consent Verdict Form, have your Foreman date and sign the form and return with it to the Courtroom.

If you adopt the Not Guilty of Sexual Intercourse Without Consent you are then required to take up the charges of Aggravated Assault.

## V.

*Verdict Forms—Aggravated Assault*

If you have found the defendant Not Guilty of Deliberate Homicide, and Not Guilty of Aggravated Kidnapping and Not Guilty of Sexual Intercourse Without Consent, you are to consider all of the charges of Aggravated Assault made against the defendant and even though you may find more than one or all of said charges of Aggravated Assault to have been proved beyond a reasonable doubt, only one Guilty of Aggravated Assault verdict form is furnished upon which to return such a verdict.

You are also furnished with a Not Guilty of Aggravated Assault verdict form if such is your verdict.

If you adopt the Guilty of Aggravated Assault verdict form, have your foreman date and sign the form and return with it to the Courtroom.

If you adopt the Not Guilty of Aggravated Assault verdict form, you are required to reach a verdict on the remaining charge of kidnapping.

## VI.

*Verdict Forms—Kidnapping*

If you have adopted the verdict form Not Guilty of Deliberate Homicide and the verdict form not guilty of Aggravated Kidnapping and the verdict form Not Guilty of Sexual Intercourse Without Consent and the verdict form Not Guilty of Aggravated Assault, you have been furnished with a verdict form upon which to return a verdict of Guilty of Kidnapping and a verdict form upon which to return a verdict of Not Guilty of Kidnapping.

If you adopt the Guilty of Kidnapping verdict form, have your foreman date and sign it and return with it to the Courtroom.

If you adopt the Not Guilty of Kidnapping verdict form you will have acquitted the defendant of all charges made against him, and rather than returning separate and multiple Not Guilty verdict forms, you have been furnished with a verdict form for Not Guilty of Any of the Offenses charged against him. Have your foreman date and sign this verdict and return with it to the Courtroom if this is your verdict.

## VII.

*Verdict Form—Not Guilty of any of the Offenses Charged.*

This form is for your use if you find that the defendant is not guilty of any of the offenses charged against him, and have not adopted the verdict form of Not Guilty of any of the Offenses charged because of a Mental Disease or Defect which excludes responsibility for conduct.